# THE STATE, Appellant, v. PARKER DISTILLING COMPANY.

### In Banc, July 3, 1911.

1. **CONSTITUTIONAL STATUTE: Presumption: Burden.** Courts presume that legislative enactments are constitutional; and that being the case, the burden is upon the party assailing its constitutionality to show that an act is unconstitutional.

2. ————: **Title: Distillers' Act: License or Tax Measure.** The title to an act regulating the manufacture and sale of distilled liquors, which reads, "An Act to license manufacturers and rectifiers of intoxicating liquors and wholesale and retail dealers in such liquors, except wines and spirits produced from grapes or fruits grown in the State of Missouri, and except social, commercial or other clubs, and druggists and pharmacists and licensed dramshop-keepers, and to provide penalties for the violation thereof," is broad enough to authorize provisions in the body of the act requiring a license and the collection of license fees, but not broad enough to authorize provisions imposing a tax upon property; and it is held that the money authorized to be collected by the body of the act is a license fee, and, therefore, the body of the act is not broader than its title, but is germane thereto.

3. ————: **License Measure: Regulation or Revenue.** A license is issued under the police power, and its primary purpose is regulation; in a taxation measure revenue is the primary object, and revenue is referable to the taxing power. An act whose object is clearly revenue cannot use a license face as a cloak. If the license fee is a tax, and the whole purpose of the act, as shown by its face, is not to regulate a business, but to raise revenue, then the act must conform to the constitutional provisions concerning taxation, or it will be void.

4. ————: **Distillers' Act: No Inspection: No Regulation: Revenue Measure.** An act requiring the manufacturer or rectifier of intoxicating liquors and wholesale and retail dealers in such liquors, in order to sell in this State, to take out a license fee, graduated according to the number of thousands of gallons sold the prior year, and to do nothing more, and there is no attempt to regulate the method or manner of sale or the kind of persons who may sell and no provision for inspection or regulation of any kind, on its face is a license measure.

5. ————: ————: **Unlawful Business: License Fees: Revenue: Title to Act.** In the eyes of the law traffic in intoxicating

liquors does not stand upon the same basis with other commercial occupations; it is differentiated from all other occupations, is separated from natural rights, privileges and immunities, is not considered a lawful business except as authorized by express legislation, and no person has a natural or inherent right to enage therein; laws pertaining to it are regarded as police regulations, and the Legislature has full constitutional power to impose a tax upon the business of liquor dealers, whether wholesalers or retailers, and such tax, whether imposed as a license fee or under the name of a tax, is not primarily designed as a means of raising revenue, but as a means of limiting or restricting the traffic, and is not therefore in reality an exercise of the taxing power. The burdens imposed by the Distillers' Act of 1909 upon manufacturers and rectifiers and wholesale and retail dealers are license fees imposed for the privilege of manufacturing, rectifying and selling intoxicating liquors. The title to that act contemplates a license fee, and the body of the act imposes license fees and not a tax, and they are therefore in harmony.

6. ————: **License: Definition.** A license is a permission granted by some competent authority to do an act which, without such permission, would be illegal. Its object is to confer a privilege or permit which without it does not exist.

7. ————: ————: **Uniformity of Taxation.** The Distillers' Act of 1909 does not purport to impose a tax upon any occupation, person or property, but simply requires all persons who wish to engage in the business therein mentioned to first procure a license from a named officer granting them permission to do so, and at the same time imposes a license fee which must be paid by each licensee in consideration for that permission or privilege, and without that permission and the payment of that fee no one can engage in that business. It is not, therefore, a tax on property, but a burden on the business, and hence the provisions of the Constitution requiring taxes to be "uniform upon the same class of subjects within the territorial limits of the authority levying the tax" and that "all property subject to taxation shall be taxed in proportion to its value," do not apply, since a licensee fee is not required to be "uniform upon the same class of subjects" or to be levied "in proportion to value."

8. ————: ————: **Denominated Tax in the Act.** The fact that the act declares "there shall be levied a tax for State purposes" does not make the money which the licensee must pay for his license a tax. It is wholly immaterial what the Legislature may have denominated it; the real question is what it in fact is.

9. ————: **License Fee: Police Regulation: No Regulation.** The fact that the Distillers' Act contains no provision for regulation does not make it any the less a police regulation.

The traffic in intoxicating liquors is a legislative outlaw, and whether the State, in exacting a license fee from those it permits to engage in it, prescribes much or no regulation for conducting the business, does not affect the question of whether or not such fee is a tax. The State may impose such conditions, burdens and regulations upon the business of dealing in intoxicating liquors as it may deem wise and proper, and no one engaging therein has any right to complain thereof. The act may prescribe a graduated scale of fees, varying as the amount of business varies, and resulting in one member of a class paying proportionately more than another.

10. ————: ————: **Uniformity As to All Dealers: Wholesalers, Druggists, Clubs, Saloon-keepers.** Nor is said Distillers' Act unconstitutional because it exempts druggists, dramshop-keepers and social and business clubs from its operation, while imposing a license tax on manufacturers and rectifiers of intoxicating liquors and on wholesale and retail dealers in such liquors. The State is under no obligation to permit the manufacture or sale of any kind of intoxicating liquor, and it may impose one kind of restrictions upon one kind of intoxicants and another kind upon another, and it may exact one fee from a dramshop-keeper, another from a druggist, another from a wholesaler or manufacturer, and none whatever from clubs, and all be valid. A law that is uniform in its application to each member of a class is valid.

11. ————: ————: **Discrimination in Favor of Home Wine Producers.** The fact that the Distillers' Act of 1909 exempts from its operation persons who sell intoxicating liquors of any kind in any quantity made of grapes or fruits grown in this State does not render it unconstitutional. Even if its exemption of such wines would on account of a lack of uniform application, render that part of the act invalid as an unlawful discrimination, that part could be held invalid and the rest valid; and a resident defendant who is not prosecuted for selling wines made from native grapes, but for a violation of the rest of the act, cannot be heard to contend that part is invalid, nor have the part he has violated declared invalid on account of the invalidity of that part.

12. ————: ————: **Exemption from Taxation.** The constitutional provision declaring "all laws exempting property from taxation" except that devoted to charitable, educational and religious purposes, etc., shall be void, does not apply to a license fee. Such fees are not a tax upon property, but a burden on the business. The Distillers' Act, requiring a license fee to be paid by dealers in intoxicating liquors except "wines or fruits made from grapes and fruits grown in this State," is not violative of said constitutional provisions, because said license fee is not a tax upon property.

13. ————: **Due Process of Law: Different License Fees: Intoxicating Liquors.** The State can absolutely abolish the traffic in intoxicating liquors, and it can do that without taking one's property without due process of law. A statute which undertakes to divide dealers in intoxicating liquors into classes, and requires one class to pay a license fee and exempts another, and imposes upon the dealers of one class a higher license fee than is imposed on those of another, does not deny to any due process of law, or take the property of one without due process of law.

14. ————: ————: **Fifth Amendment.** The Fifth Amendment of the Constitution of the United States has no reference to laws of a State, but relates solely to enactments of Congress.

15. ————: **Distillers' Act: Abridging Privileges of Citizens of Other States.** The right to sell intoxicating liquors is not one of the privileges or immunities guaranteed by those sections of the United States Constitution which forbids any State to enforce any law which shall "abridge the privileges or immunities of citizens of the United States." Even if an act exempts "makers and sellers of wines and spirits produced from grapes and fruits grown in this State" from the payment of license fees and the necessity of obtaining a license, while imposing heavy license fees on makers and sellers of wines and spirits produced from grapes and fruits grown in other States, it would not abridge the privileges or immunities of citizens of those States. No one has the right to sell intoxicating liquors except persons to whom the State grants that privilege.

16. ————: ————: ————: **Impost Duty.** Nor does said act, by such exceptions and imposition of license fees, violate that provision of the United States Constitution which prohibits any State from levying an impost or import duty or tax on property coming into the State from other States.

17. ————: ————: **Interstate Commerce: Wilson Act.** The Wilson Act, enacted by Congress in 1890, was intended to subject intoxicating liquor shipped from one State into another to the laws of the State to which it was shipped, and thereby subject both foreign and domestic liquors to the same law, but nothing more. It still remains true, in spite of that act, that a State cannot establish a system which, in effect, discriminates between interstate and domestic commerce in commodities which it is lawful to make and to use.

18. ————: ————: ————: **License Fees Imposed on Foreign Commodities Only.** A statute, though designed as a police regulation, cannot impose a burden in the form of license fees upon interstate commerce, which is withheld from like commodities made within the State. An act which discriminates in favor of makers and sellers of wines and spirits made from

grapes and fruits grown in the State, by relieving them from the burden of license fees, and against the same kind of wines and fruits made from grapes and fruits grown in other States, by imposing on them license fees, is void, as in conflict with the Interstate Commerce Clause of the United States Constitution. The State cannot impose more onerous public burdens of taxes or license fees upon the products of other States brought into it than it imposes upon like products of its own territory. And it is immaterial whether the discriminating burden is a tax or a license fee, for either is a burden imposed on interstate commerce. The act is violative of section 8 of article 1 and of the Fourteenth Amendment of the United States Constitution.

Appeal from St. Louis Court of Criminal Correction. —*Hon. Wilson A. Taylor,* Judge.

AFFIRMED.

*Elliott W. Major,* Attorney-General, and *John M. Atkinson,* Assistant Attorney-General, for the State.

(1) The traffic in intoxicating liquors in the State of Missouri is declared by law to be illegal. It is not a primary, natural or fundamental right, but is an occupation which no one has the right to pursue without a license. State v. Austin, 10 Mo. 591; State v. Hudson, 13 Mo. App. 61; Higgins v. Talty, 157 Mo. 287; State v. Bixman, 162 Mo. 21; Black on Intoxicating Liquors, secs. 51, 127, 128, 189; Crowley v. Christensen, 137 U. S. 86; State v. Finney, 178 Mo. 385. (2) All statutes regulating the manufacture and sale of intoxicating liquors are enacted by virtue of the police power of the State. Every statute, State or Federal, upon the subject which has been held constitutional, was sustained upon the ground that it was the proper exercise by the Legislature of the police power of the State. State ex rel. v. Hudson, 78 Mo. 302; License Cases, 12 Law Ed. 314; 8 Cyc. 683; State ex rel. v. Mercantile Co., 184 Mo. 184; State v. Addington, 12 Mo. App. 221; State v. Beattie, 16 Mo. App. 131; Cearfoss v. State, 44 Md. 403. (3) The

act of the Legislature, approved June 1, 1909, providing licenses for those engaged in the business or occupation of manufacturing, rectifying or selling intoxicating liquors is presumed to be constitutional. The Legislature is presumed to have been as careful to observe the requirements of the constitution in enacting the law as the courts in applying it. State ex rel. v. Aloe, 152 Mo. 477; State v. Cantwell, 179 Mo. 261; State ex rel. v. Railroad, 48 Mo. 471; State ex rel. v. County, 144 Mo. 280; Ex parte Loving, 178 Mo. 203; County v. Griswold, 58 Mo. 192; State v. Able, 65 Mo. 357. (4) The State has the power to prohibit or to regulate and impose conditions upon persons who desire to engage in the traffic of intoxicating liquors. In doing so, the State deals not with the individual, but with men in their relations to each other. State v. Bixman, 162 Mo. 37; Black on Intoxicating Liquors, secs. 31, 39, 46, 55, 107, 108, 109, 114, 115; State v. Austin, 10 Mo. 591; State v. Lemp, 16 Mo. 389; State v. Searcy, 20 Mo. 489; State v. Hudson, 78 Mo. 302; Higgins v. Talty, 157 Mo. 280; State v. Bixman, 162 Mo. 1. Where the Legislature has power to impose a license fee or license tax on an occupation, it has the added power to make it a penal offense for any person to engage in that occupation without first paying the license fee or license tax placed thereon. Black on Intoxicating Liquors, secs. 37, 58, 107; State v. Finney, 178 Mo. 31. (5) There is a wide difference between taxation and the licensing of a business or occupation. A business may be licensed and not be taxed, or it may be taxed and yet not licensed. There is no necessary connection between them. Black on Intoxicating Liquors, secs. 108, 127, 128; State v. Bixman, 16 Mo. 1; Higgins v. Talty, 157 Mo. 287. (6) The defendant seeks to apply to this, a license law, the rule which might apply to an act purely for revenue, that is, a law levying a tax upon the property. It leaves

out of view the fact that the enactment under con-
sideration is a law within the police power of the
State and directed against a traffic which is itself ille-
gal—a traffic which is conducted not as a primary,
natural or fundamental right, as is the case in the
arteries of commerce, but is conducted under a special
permit or license issued by the State in the exercise
of its police power. Black on Intoxicating Liquors,
sec. 55; State v. Bixman, 162 Mo. 1. (7) The act
does not violate sec. 28, art. IV, Constitution of Mis-
souri, as charged in the first specification that the
bill contains more than one subject, and that the sub-
ject is not clearly expressed in the title. State v. Mead,
71 Mo. 286; State v. Bixman, 162 Mo. 19; State v.
Bengsch, 170 Mo. 105; State v. Bockstruck, 136 Mo.
335; Statutory Crimes (2 Ed.), sec. 36a. (8) The
act is not a revenue measure, and does not undertake
to impose taxes on occupations, persons and property
which are not uniform on the same class or classes of
subjects, and does not violate sec. 3, art. 10, Consti-
tution. (a) ''A license is essentially a grant
of a special privilege to one or more persons,
not enjoyed by citizens generally, or, at least, not en-
joyed by a class of citizens to which the licensee be-
longed. A common right is not the creature of a li-
cense law.'' 5 Words and Phrases, p. 4137; State v.
Frame, 39 Ohio 413; Youngblood v. Sexton, 32 Mich.
406; State v. Hipp, 38 Ohio, 199.; Sonora v. Curtin, 137
Cal. 583; Cooley on Taxation, 596. (b) The Act of
1909, licensing manufacturers and rectifiers of intoxi-
cating liquors and wholesale and retail dealers therein,
etc., in a general way provides it shall be unlawful
for any person, firm or corporation to manufacture,
rectify, sell or expose to sale, intoxicating liquors of
any kind in any quantity without a license from the
State so to do. The act prescribes where and how the
applications for such licenses shall be made and the

236 Sup—15

statements to be contained therein. It is immaterial whether you call it by the name of a tax, a license, a fee, a license fee, a license tax or what not. State v. Bixman, 162 Mo. 26; Black on Intoxicating Liquors, sec. 107. (c) The fact that even a large revenue may follow is of no concern. If this were not so then the State would be powerless to regulate the illegal traffic or business. The Legislature would be required to nicely gauge its every act and see that in regulating these illegal businesses no revenue should follow. Higgins v. Talty, 157 Mo. 280; State v. Davis, 108 Mo. 670; Beer Co. v. Mass., 97 U. S. 25; State v. Hudson, 78 Mo. 302; Ex parte Tuttle, 91 Cal. 589; State v. Thompson, 160 Mo. 333; Patterson v. Donovan, 20 Nev. 75; Cooley on Const. Lim. (6 Ed.), 591; Cooley on Const. Lim. (3 Ed.), 727; L'Hote v. New Orleans, 177 U. S. 596; Crowley v. Christensen, 137 U. S. 86. (d) The defendant seems to rely upon the fact that the Supreme Court in the case of State v. Bengsch, 170 Mo. 81, held the Act of 1901, providing for a State tax on distilled liquors, and creating the office of special license commissioner was unconstitutional. The court did so by reason of the fact that the act was a revenue measure, a tax upon property, and therefore not uniform in its operation upon the same class of subjects in violation of sec. 3, art. 10 of the Constitution. Troll v. Hudson, 78 Mo. 302; State v. Bixman, 162 Mo. 1. (e) The defendant objects and says the Act of 1909 exempts from the operation of the law wines or spirits made from grapes or fruits grown in this State and exempts from its operation liquors sold by dramshop keepers. The dramshop keeper is licensed under another law and pays his license to sell drinks at retail. He belongs to a special class already provided for, and it is proper to exempt him here. That does not affect the uniform operation of the law upon each of the susceptible classes provided for in the act. The act applies to manufac-

turers, rectifiers, wholesalers and merchants, and graduates the charge or license fee then for the various classes arising under the law. State v. Bixman, 162 Mo. 30; Clark v. Titusville, 184 U. S. 330; Black on Intoxicating Liquors, secs. 109, 232. Uniformity on all members of a class suffices, and this is true even though the business or the class is one not engaged in the selling of liquor and under bane of the law, but engaged in the ordinary business affairs, private or public. State v. Cantwell, 179 Mo. 245; State v. Swagerty, 203 Mo. 517; Hume v. Railroad, 82 Mo. 231; Railroad v. Hume, 115 U. S. 522. The question as to exempting wines and liquors made from grapes grown in this State has been held against defendant's contention in State v. Stucker, 58 Iowa 496; McGuire v. State, 42 Ohio 530; State v. Bixman, 160 Mo. 1; Refining Co. v. Louisiana, 179 U. S. 89; Williams v. Fears, 179 U. S. 270; Cox v. Thompson, 202 U. S. 446. (f) But for argument, say the provision of the law of 1909, exempting wines or spirits made from grapes or fruits grown in this State, violates the constitutional provision under consideration, still that would be of no consequence. The challenge in that particular does not and would not affect the law in a vital way. That exemption can be stricken from the act and the bill survive, and be as valid and good for the purposes for which enacted as though it remained in the bill. Tiernan v. Treasurer, 102 U. S. 123. The information filed against the defendant by the prosecuting attorney of the city of St. Louis, does not charge it with the manufacture and sale of wines or spirits made from grapes or fruits grown in this State. On the other hand the information charges it with manufacturing, rectifying and selling other intoxicating liquors not being wines or spirits made from grapes or fruits grown in this State, etc. The information removes the defendant from the exemption named in the act. It manufactures and sells

liquors other than those made from grapes and fruits. The act does not discriminate as to any class. If discrimination, it is as to liquors from other States made from grapes and fruits. But that does not affect the equal operation on the same classes. Each is affected alike. Each can go to other States and buy other liquors, etc., and uniformity on the same classes still adheres. State v. Bixman, 162 Mo. 40; Black on Intoxicating Liquors, sec. 109. The law is well settled in this State that part of a statute may be declared unconstitutional and the residue declared constitutional and valid. The test is not whether the void and valid parts are found in the same section, but rather whether they are essentially and inseparately connected. If the unconstitutional part can be separated from the act and leave the act capable of being executed in conformity with the apparent legislative intent, regardless of that which is rejected, the valid portions must stand and the other parts of the act regarded as stricken out. Birch v. Plattsburg, 180 Mo. 418; State v. Bockstruck, 136 Mo. 353; State ex rel. v. Field, 119 Mo. 612; Railroad v. Evans, 85 Mo. 307; State ex rel. v. Pond, 93 Mo. 635; Allen v. Louisiana, 103 U. S. 80; Tiernan v. Treasurer, 102 U. S. 123. (g) The act is a license law enacted by virtue of the police power of Missouri intended to regulate a certain traffic which is illegal without a special permit from the State. Counsel finds fault with the graduation and classification of the different occupations in sec. 5, and contends that action makes it a revenue measure. The provisions of section 5 were proper because it became necessary to graduate the license tax and divide the occupation into the several classes in order that the law might be uniform in its operation upon the same class. Clark v. Titusville, 184 U. S. 329; State v. Bixman, 162 Mo. 36; Black on Intoxicating Liquors, secs. 109, 232; State v. Powell, 100 N. C. 525. It has been held livery stables could be charged license fees in

proportion to the number of carriages kept for hire. Howland v. Chicago, 108 Ill. 500. It has been held that a license tax may be imposed upon a hotel and the fee graduated according to the number of rooms devoted to the accommodation of the public. St. Louis v. Bircher, 7 Mo. App. 169; St. Louis v. Bircher, 76 Mo. 431. The following authorities sustain the principle. Ex parte Mount, 66 Cal. 448; Allentown v. Gross, 132 Pa. St. 319; Knisely v. Cottrell, 196 Pa. St. 614; Sacramento v. Crocker, 16 Cal. 119; Williamsport v. Wenner, 172 Pa. St. 173; Titusville v. Clark, 195 Pa. St. 634; County v. Greenburg, 120 Cal. 300; Burlington v. Ins. Co., 31 Iowa 102; State v. Bixman, 162 Mo. 36; Kansas City v. Richardson, 90 Mo. App. 450; St. Louis v. Bowler, 94 Mo. 630; Assn. v. Waddill, 138 Mo. 628; St. Louis v. Green, 7 Mo. App. 468; St. Louis v. Green, 70 Mo. 562; Kansas City v. Grush, 151 Mo. 562; St. Louis v. Sternberg, 69 Mo. 289; St. Charles v. Elsner, 155 Mo. 671; Aurora v. McGannon, 138 Mo. 38; Troy v. Harris, 102 Mo. App. 51; Troll v. Hudson, 78 Mo. 302. (9) The act does not violate sec. 4, art. 10, Constitution, and does not impose a tax on property in the State not in proportion to its value. State v. Bixman, 162 Mo. 24; Black on Intoxicating Liquors, secs. 109, 232; Carthage v. Rhodes, 101 Mo. 175; Express Co. v. St. Joseph, 66 Mo. 675. (10) The act does not violate secs. 6 and 7, art. 10, Constitution of Missouri, as to the exemption of property from taxation. These sections of the Constitution relate only to exemptions connected with the taxation of property. State v. Henderson, 160 Mo. 217. (11) The act does not violate sec. 30, art. 2, Constitution, and its enforcement would not deprive the defendant of its liberty and its property without due process of law. Black on Intoxicating Liquors, secs. 37, 83, 108, 109; Adler v. Whitbeck, 44 Ohio 539; State v. Cantwell, 179 Mo. 264; Dent v. W. Va., 129 U. S. 114. This section has no reference to those stat-

utes imposing license fees regulating a business or occupation. If it has no application to such generally, it clearly would have no application to a license fee regulating a traffic which, without the license, is illegal under the laws of the State. The defendant has no right to engage in the traffic of intoxicating liquors at all. The State can abolish the traffic entirely, and if it can abolish it and not thereby take its property without due process of law, how can it be said his property is taken without due process of law in regulating the traffic. Mugler v. Kansas, 123 U. S. 623; Crowley v. Christensen, 137 U. S. 91; Cox v. Texas, 202 U. S. 446; Downham v. Alexandria, 10 Wall. 173; Kidd v. Pearson, 128 U. S. 1; Williams v. Fears, 179 U. S. 270; Moore v. Indianapolis, 120 Ind. 483; Drake v. Kaiser, 73 Iowa 703. The State courts have held this section of the Constitution is not violated by laws regulating businesses or occupations. St. Louis v. Mfg. Co., 139 Mo. 560; State v. Doring, 194 Mo. 414; State v. Davis, 194 Mo. 485; State v. Murlin, 137 Mo. 297; State v. Bixman, 162 Mo. 1. (12)    The act does not violate the Fifth Amendment to the Constitution of the United States, not being an attempt to deprive the citizens of the State of Missouri of their property without due process of law. The Fifth Amendment to the Federal Constitution does not relate to laws enacted by the States, but solely to the enactments of Congress. Livingston v. Moore, 32 U. S. 469; Eilenbecker v. Court, 134 U. S. 34; Brown v. New Jersey, 175 U. S. 174; Thorington v. Montgomery, 147 U. S. 490. (13)    The act does not violate sec. 1 of the Fourteenth Amendment to the Constitution of the United States, and does not attempt to abridge the privileges and immunities of citizens of the United States, and does not attempt to deprive the citizens of the several states and of the State of Missouri of their property without due process of law, and does not deny to those who come within the provisions of said act the equal

protection of the law. Giozza v. Tiernan, 148 U. S. 662; Barbier v. Connolly, 113 U. S. 30; Powell v. Pennsylvania, 127 U. S. 683; Ex parte Kemmler, 136 U. S. 448; Mugler v. Kansas, 123 U. S. 623. Thus it will be seen from the opinions of the Supreme Court of the United States upon the subject that when a state has enacted a law under its police power regulating the health, morals and good government of its citizens, it cannot violate any right under the Fourteenth Amendment to the Federal Constitution. Such legislation is the absolute right of the State. It cannot be supposed that the states intended by adopting the Fourteenth Amendment to impose restraint upon the exercise of their powers for the protection of the safety, health or morals of a community. No legislature can bargain away the public health or the public morals. The people themselves cannot do it, much less their servant. Government is organized with a view to their preservation and cannot divest itself of the power to provide for them. Giozza v. Tiernan, 148 U. S. 657; Barbier v. Connolly, 113 U. S. 28; Ex parte Kemmler, 136 U. S. 436; Powell v. Pennsylvania, 127 U. S. 678; Mugler v. Kansas, 123 U. S. 623; Express Co. v. Seibert, 142 U. S. 339; Crowley v. Christensen, 137 U. S. 86; Clark v. Titusville, 184 U. S. 329; Dent v. West Virginia, 129 U. S. 124. (14) The act does not violate sec. 10, art. 1, Constitution of the United States, and does not attempt to levy an impost or import duty or tax on the property of the several states, coming into Missouri. Black on Intoxicating Liquors, secs. 70, 82, 83; State v. Bixman, 162 Mo. 39; State v. Bengsch, 170 Mo. 116; Slaughter House Cases, 16 Wall. 36; Bartemeyer v. Iowa, 18 Wall. 129; Barbier v. Connolly, 113 U. S. 27; Crowley v. Christensen, 137 U. S. 86; Neilson v. Garza, 2 Woods, 287; Guano Co. v. Board, 171 U. S. 345. (15) The act does not violate the provisions of clause 3, sec. 8, art. 1, Constitution of the United States, and is not an attempt to regu-

late commerce between the several states and the State of Missouri. The Act of 1909 is confined to persons and property and the business fully within the jurisdiction of the State of Missouri, consequently, it does not violate this constitutional provision, known as the "commerce clause." Even if this were not so, the Wilson Law, approved August 8, 1890, removes this challenge for good and for all. State v. Bengsch, 170 Mo. 116. Black on Intoxicating Liquors announces the correct doctrine, which was the law, outside of the Original Package Decision, even before the adoption of the Wilson Law, to-wit, that State legislation prohibiting or regulating the manufacture and sale of intoxicating liquors if confined to persons and property within the jurisdiction of the State does not violate the Federal Constitution, and is not a regulation of foreign or interstate commerce. Black on Intoxicating Liquors, secs. 37, 70, 76, 29. In the License Cases, these questions were passed upon and there held that such legislation affecting the liquor traffic did not violate and was not inconsistent with any of the provisions of the Federal Constitution or acts of Congress. This is true either considered with or without the Wilson Law. This was the law before its enactment, and is therefore more strongly intrenched today by the enactment of that law. License Cases, 12 Law Ed. 256; Kidd v. Pearson, 128 U. S. 1. In the case of Sherlock v. Alling, 93 U. S. 99, and in Plumley v. Massachusetts, 155 U. S. 461, it was stated by the court that in conferring upon Congress the regulation of commerce, it was never intended to cut the State off from legislation on all subjects relating to the health, life and safety of their citizens, though the legislation might indirectly affect the commerce of the country. Legislation in a great variety of ways may affect the commerce and persons engaged in it without constituting the regulation of it, within the meaning of the Constitution. Sherlock v. Alling, 93 U. S. 99; Plum-

ley v. Mass., 155 U. S. 461; Railroad v. Kentucky, 161 U. S. 701; Gibbons v. Ogden, 9 Wheat. 194; State ex rel. v. Oil Co., 218 Mo. 376. Congress has no power to interfere with police regulations relating exclusively to the internal trade of the States. U. S. v. DeWitt, 9 Wall. 41. Patterson v. Kentucky, 97 U. S. 501.

*Johnson, Rule & Allen* and *Loomis C. Johnson* for respondent.

(1) This action cannot be maintained by the State because the Act of 1909, upon which the information is based, is violative of sec. 28, art. 4, Constitution, in that the subject of the act is not clearly expressed in its title, to-wit: (a) The title recites that the act is "to license manufacturers and rectifiers of intoxicating liquors," etc., and in consonance therewith the act provides for the issuing of licenses thereunder and for the collection of a license fee of seventy-five cents for each license issued. But sec. 5 of the act further provides that "upon every license granted under the provisions of this act there shall be levied a tax for State purposes" varying in amounts from $100 to $1000, according to the particular kind of liquor business carried on and the quantities in gallons or barrels of liquors sold by each licensee; while no mention is made in the title of the act of this latter provision. The provision of the act relative to the granting of licenses is based on the police power of the State, while the provision of sec. 5 imposing the "tax for State purposes" is predicated on the taxing power of the State, and this last provision makes the bill a taxing measure instead of a police regulation. Brown v. Maryland, 12 Wheat. 425; Welton v. Missouri, 91 U. S. 275; Cook v. Pennsylvania, 97 U. S. 566; Leloup v. Mobile, 127 U. S. 640; Brennan v. Titusville, 153 U. S. 289; State v. Bengsch, 170 Mo. 109; City v. Ernst,

95 Mo. 360; City v. Spiegel, 75 Mo. 145; City v. Adams, 90 Mo. App. 35; State ex rel. v. Ashbrook, 154 Mo. 375; State ex rel. v. Boyd, 58 L. R. A. 108. (b) The "subject" of the act, therefore, is the imposition of a "tax for State purposes," in the exercise of the taxing power, and, as the same is not mentioned in the title, the act is void. St. Louis v. Weitzel, 130 Mo. 616; State v. Burgdoerfer, 107 Mo. 30; State v. C. & T. Co., 171 Mo. 642; State v. Bengsch, 170 Mo. 107. (2) The act, being a revenue measure, undertakes to impose taxes on occupations, persons and property which are not uniform on the same class or classes of subjects in the following particulars and is therefore violative of secs. 3 and 4, art. 10, Constitution of Missouri. While the act provides a uniform license fee of seventy-five cents for each license issued, it also imposes the following substantial taxes on those whose occupations are subjected to the operations of the act, to-wit: 1st. On merchants selling intoxicating liquors, each $100 to $1000 per annum, according to quantity sold. 2d. On sellers of malt or fermented liquors at wholesale where sales are made at other than places of manufacture, each $100, fixed, per annum. 3d. On manufacturers of malt or fermented liquors, from $250 to $1000 each per annum, according to quantity produced. 4th. On compounders, etc., of spirituous intoxicating liquors, each, $250 to $1000 per annum, according to quantity produced. 5th. On manufacturers of spirituous intoxicating liquors, each $250 or $500 per annum, according to the quantity produced. Of the other hand, the act expressly exempts from its operation the following who manufacture or deal in the liquors mentioned, to-wit: (a) "Makers and sellers of wines and spirits made from grapes or fruits grown in the State of Missouri." (b) Druggists and pharmacists who deal in or sell distilled, malt, rectified or fermented liquors or wines. (c) Social, commercial or other clubs which sell such liquors or

wines. Because of these last-mentioned exemptions the act, being a revenue measure, is unequal in its operation and void. State v. Bengsch, 170 Mo. 81; St. Louis v. Coal Co., 113 Mo. 83; City v. Spiegel, 75 Mo. 145. (3) The act imposes a tax on certain classes of property while it exempts other property of the same class, contrary to sec. 6, art. 10, Constitution of Missouri. State v. Bengsch, 170 Mo. 114. (4) Because of the exemptions and discriminations mentioned in point 2, the act attempts to deprive those to whom it applies of their property without due process of law, contrary to the provisions of sec. 1, art. 14, Constitution of United States, and sec. 3, art. 2, Constitution of Missouri, and is therefore void. State v. Ashbrook, 154 Mo. 375; State v. Julow, 129 Mo. 172; State v. Thayer, 158 Mo. 36; State v. Loomis, 115 Mo. 307; Giozza v. Tiernan, 148 U. S. 659; Railroad v. Pennsylvania, 134 U. S. 232; Barbier v. Connolly, 113 U. S. 31; State v. Bengsch, 170 Mo. 113; City v. Coal Co., 113 Mo. 83; City of Spiegel, 75 Mo. 145. (5) The act (sec. 1) entirely exempts from its operation "makers and sellers of wines or spirits produced from grapes or fruits grown in this State," while it imposes a heavy tax on makers and sellers of wines and spirits produced from grapes or fruits grown in other States, as well as upon such wines and spirits themselves, and thereby denies to the citizens of other states the equal protection of the laws of the State of Missouri; attempts to regulate commerce between such other States and the State of Missouri, and attempts to levy an impost or import duty or tax on the products of other states coming into the State of Missouri; all contrary to sec. 1, art. 14; sec. 1, art. 4; sec. 8, art. 1; sec. 10, art. 1, Constitution of the United States. State v. North, 27 Mo. 464; State v. Bengsch, 170 Mo. 113; Pierce v. State, 13 N. H. 582; Brennan v. Titusville, 153 U. S. 289; Brown v. Maryland, 12 Wheat. 425; Darnell v. Memphis, 208 U. S. 113; Welton v.

Missouri, 91 U. S. 275; Minnesota v. Barber, 136 U. S. 313; Brimmer v. Rebman, 138 U. S. 78; A. S. & W. Co. v. Speed, 192 U. S. 519; Guy v. Baltimore, 100 U. S. 434; Walling v. Michigan, 116 U. S. 446; Philadelphia Co. v. Penn., 122 U. S. 326; Voight v. Wright, 141 U. S. 62; Woodruff v. Parham, 75 U. S. 123.  (6) The provision of the act which exempts from its operation ''makers or sellers of wines or spirits produced from grapes or fruits grown in this State'' is not severable from the other provisions of the act, and therefore taints the entire act and renders it inoperative and void.  State v. Bengsch, 170 Mo. 113; Welton v. Missouri, 91 U. S. 275; Vines v. State, 67 Ala. 73.  (7)  While it does not appear affirmatively from the information or from the motion to quash that the ''wines and spirits produced from grapes or fruits grown in this State,'' which are exempted from the operation of the act, are made and sold within this State, or that wines and spirits are made in other states from grapes and fruits grown therein and imported into and sold by dealers in large quantities in this State, or that such wines and spirits are not different in any way as beverages or commodities from other intoxicating liquors which are made from grain and subject to the provisions of the act, nevertheless these facts do appear inferentially from the provisions of the act itself, besides they are so generally known that this court will take judicial notice of the same in determining the scope and validity of the act. Grimes v. Eddy, 126 Mo. 168; Hobbs v. Railroad, 113 Mo. App. 133; City v. Butt, 88 Mo. App. 237; Gibbs v. Railroad, 104 Mo. App. 276; State v. Effinger, 44 Mo. App. 83; Minnesota v. Barber, 136 U. S. 313.

WOODSON, J.—The prosecuting attorney of the city of St. Louis, on October 19, 1909, filed in the St. Louis Court of Criminal Correction an information, duly verified, charging the defendant with having en-

gaged in the business of manufacturing, selling and exposing for sale in that city intoxicating liquors, in violation of an act of the Legislature, approved June 1, 1909, Laws 1909, p. 654.

The sufficiency of the information is not challenged, and for that reason, we will not copy it in the statement of the case.

On October 20th, thereafter, the defendant was arraigned and pleaded not guilty. On the 26th of the same month defendant filed the following motion to quash the information, to-wit:

"1. That the Act of the General Assembly of Missouri, approved June 1, 1909, and entitled, 'An act to license manufacturers and rectifiers of intoxicating liquors and wholesale and retail dealers in such liquors, except wines and spirits produced from grapes or fruits grown in the State of Missouri, and except social, commercial or other clubs, druggists, and pharmacists and licensed dramshop-keepers, and to provide penalties for a violation thereof,' upon which said information is based is unconstitutional, inoperative and void; because,

"First. Said act is in violation of the provisions of section 2 of article 4 of the Constitution of the United States, in that it denies to the citizens of other states the privileges and immunities granted to the citizens of the State of Missouri thereunder.

"Second. Said act is in violation of the provisions of the third clause of section 8, article 1, of the Constitution of the United States, in that it attempts to regulate commerce between the several states and the State of Missouri.

"Third. Said act is in violation of the second clause of section 10, article 1, of the Constitution of the United States, in that it attempts to levy an impost duty or tax on the products of the several states coming into the State of Missouri.

"Fourth. Said act is violative of the Fifth Amendment of the Constitution of the United States, in that it attempts to deprive the citizens of the State of Missouri of their property without due process of law.

"Fifth. Said act is in violation of section 1 of the Fourteenth Amendment to the Constitution of the United States, in that it is an attempt to abridge the privileges and immunities of citizens of the United States, and further, in that it is an attempt to deprive citizens of the several states and of the State of Missouri of their property without due process of law, and further, that it denies to those persons who come within its provisions the equal protection of the law.

"2. That said act of the General Assembly of Missouri, approved June 1, 1909, entitled as above, is unconstitutional, inoperative and void; because,

"First. Said act is violative of section 30, article 2, of the Constitution of the State of Missouri, in that the enforcement thereof would deprive the defendant of his liberty and his property without due process of law.

"Second. Said act is violative of section 28, article 4, of the Constitution of the State of Missouri, in that it contains more than one subject, also that the subject of the same is not clearly stated in its title.

"Third. Said act is violative of section 3, article 10, of the Constitution of the State of Missouri, in that the tax levied under the provisions of said act is not uniform upon the same class of subjects within the territorial limits of the State.

"Fourth. Said act is violative of section 4, article 10, of the Constitution of the State of Missouri, in that all property in the State subject to the tax imposed by the said act is not taxed under the provisions of said act in proportion to the value of said property.

"Fifth. Said act is violative of section 7, article 10, of the Constitution of the State of Missouri, in

that it undertakes to exempt property from taxation in contravention of said constitutional provision."

The court sustained said motion to quash and entered its final judgment discharging respondent therein. Thereafter, in due time and form, the prosecuting attorney appealed the cause to this court.

The act under which this prosecution was instituted, was passed by the Legislature in 1909, and is as follows:

"An act to license manufacturers and rectifiers of intoxicating liquors and wholesale and retail dealers in such liquors, except wines and spirits produced from grapes or fruits grown in the State of Missouri, and except social, commercial or other clubs, and druggists and pharmacists and licensed dramshop-keepers, and to provide penalties for a violation thereof.

"Be it enacted by the General Assembly of the State of Missouri, as follows:

"Section 1. It shall be unlawful for any person, firm or corporation to manufacture, rectify, sell or expose to sale in this State intoxicating liquors of any kind in any quantity, except wines or spirits made from grapes or fruits grown in this State, without first taking out a license under the provisions of this act; but this act shall not apply to the sale of liquors by dramshop-keepers licensed under the laws of this State: *Provided,* that the possession of an internal revenue license, issued by the Government of the United States, for the manufacture, rectifying or sale of malt, fermented, spirituous or other intoxicating liquors within this State, except by licensed dramshop-keepers and makers and sellers of wines or spirits produced from grapes or fruits grown in this State, shall be prima-facie evidence that the person, firm or corporation named in such internal revenue license is engaged in the manufacture or sale of intoxicating liquors in the meaning of this act.

"Sec. 2. Application for license to manufacture,

rectify or sell intoxicating liquors under the provisions of this act shall be made to the county court or the county or the excise commissioner of the city in which the applicant proposes to manufacture, rectify or sell such liquors and shall designate and describe the location of the plant or plants at which such liquors are to be manufactured or rectified; and if the application is for license to sell such liquors, it shall state the kind of business conducted by the applicant, and shall designate and describe the place at which such liquors are to be sold and in what quantities and how to be dispensed: Provided, however, that every application to manufacture, rectify or sell intoxicating liquors contrary to any law of this State or any ordinance of any municipality therein shall be void and shall be rejected.

"Sec. 3. Every application for license under the provisions of this act shall be accompanied by a statement in writing, subscribed and sworn to in the presence of the court or commissioner hearing the application, setting forth the full amount and kind of liquors, in barrels or gallons, manufactured, rectified, or sold by the applicant within one year next preceding the date of the application; but if the applicant, at the time of the application, is not engaged in the manufacture or sale of such liquor, then the statement shall set forth an estimate of the amount and kind of liquors, in barrels or gallons, which the manufacturing plant or plants designated in the application will produce in one year, or an estimate of the quantity and the kind of liquors to be sold within one year under the license applied for.

"Sec. 4. Upon approval of the application and statement and payment of the license tax herein provided, the county court or excise commissioner shall grant to the applicant a license to conduct the business designated in the application at the place therein designated for a period of one year from the date of such

license, but no license granted under the provisions of this act shall authorize the manufacture, rectification, sale or disposition of intoxicating liquors in any quantity contrary to the provisions of any law of this State or of any ordinance of the city in which the license is operative. For every license granted under the provisions of this act the applicant shall pay to the county clerk or excise commissioner a fee of seventy-five cents for administering oath to the statement herein provided, and seventy-five cents for issuing the license, said fees to be accounted for by the clerk or commissioner as are fees for granting and issuing dramshop licenses.

"Sec. 5. Upon every license granted under the provisions of this act there shall be levied a tax for State purposes, to be determined as follows, to-wit: For the sale of intoxicating liquors by a merchant in any aggregate quantity less than five thousand gallons in one year, one hundred dollars; for the sale of such liquors by such merchant in any aggregate quantity more than five thousand and less than ten thousand gallons in one year, one hundred and fifty dollars, and one dollar for each thousand gallons more than ten thousand gallons or fraction of one thousand gallons more than five hundred, but the maximum tax upon a license for a liquor merchant shall not exceed in any case the aggregate sum of one thousand dollars. For the sale of malt or fermented liquors at wholesale, except at the place where such liquors are produced, one hundred dollars. For the maunfacture of malt or fermented intoxicating liquors, two hundred and fifty dollars for the first fifty thousand barrels or less shown in the statement of the total product of the applicant for one year, and one dollar for each additional one thousand barrels of such total product or fraction of one thousand more than five hun-

236 Sup.—16

dred, but the maximum tax upon a license for the manufacture of malt or fermented intoxicating liquors shall not exceed in any case the aggregate sum of one thousand dollars. For the compounding, blending or otherwise rectifying of spirituous intoxicating liquors, two hundred and fifty dollars, and five dollars for each one thousand gallons or fraction thereof more than five hundred gallons of the total.product of the applicant for one year in excess of fifty thousand gallons, but the maximum tax upon a license for the rectifying of such liquors shall not exceed in any case the aggregate sum of one thousand dollars. For the manufacture of spirituous intoxicating liquors, two hundred and fifty dollars; but if the annual product of the applicant exceeds one hundred thousand gallons, five hundred dollars: *Provided,* that manufacturers of intoxicating liquors and rectifiers thereof shall not be required to take out a merchant's license for the sale of their products at wholesale at the place of manufacture.

"Sec. 6. The county court or excise commissioner shall cause to be delivered to the collector of the county or city a statement of every license granted under the provisions of this act, and the amount of the license tax thereon, and charge the collector with the amount contained in every such statement.

"Sec. 7. The collector shall, without delay, collect from the applicant the amount specified in such statement and give a receipt for the same, and shall account for the money so received as for money for State purposes from dramshop licenses.

"Sec. 8. The county clerk or excise commissioner shall not deliver the license granted until the applicant shall produce the receipt of the collector showing that the license tax thereon has been fully paid.

"Sec. 9. Every person, for himself or as agent

or representative of any person, firm or corporation required by the provisions of this act to make and file a sworn statement of the products or sales for one year, or estimate of such products or sales of any applicant for license under this act, who, under oath, knowingly makes any false statement in such sworn statement, shall be deemed guilty of a felony, and, upon conviction thereof, shall be punished by imprisonment in the penitentiary for a term not less than two years nor more than five years.

"Sec. 10. Every brewer, fermenter, distiller or rectifier of malt, brewed, distilled or other spirituous intoxicating liquors, except wines or spirits produced from grapes or fruits grown in this State, shall be deemed to be a manufacturer or rectifier of intoxicating liquors in the meaning of this act. Every person, firm or corporation, required by the Government of the United States to secure a Government license for the manufacture, rectification, sale or disposition of intoxicating liquors, except dramshop-keepers licensed under the laws of this State and makers and sellers of wines or spirits produced from grapes or fruits grown in this State, and except druggist and pharmacist, or a social, commercial or other club, shall be subject to the provisions and penalties of this act.

"Sec. 11. Any person, firm or corporation, or agent or respresentative thereof, who shall engage in any business for which a license is required by this act without and before securing the license as aforesaid and paying the license tax herein provided, shall be deemed guilty of a misdemeanor, and, upon conviction, shall be punished by a fine not less than five hundred nor more than one thousand dollars, and may also be imprisoned in the county jail for a period not to exceed one year."

## OPINION.

I.   This appeal presents for determination the constitutionality of the Act of the Legislature, approved June 1, 1909, previously copied.

The State contends that the act is constitutional, and the respondent denies its constitutionality.   If constitutional, the judgment of the Court of Criminal Correction will have to be reversed and remanded, but if unconstitutional the judgment will have to be affirmed.

Since it is the duty of the courts to presume that a legislative enactment is constitutional (State ex rel. v. Aloe, 152 Mo. l. c. 477; Ex parte Loving, 178 Mo. l. c. 203; State v. Cantwell, 179 Mo. l. c. 261; State ex rel. v. Pike County, 144 Mo. l. c. 280), we will cast the burden upon the respondent to show that this act is unconstitutional, before we can affirm the judgment upon that ground; and we will therefore consider its contentions in that regard, as far as practical, in the orders stated by its counsel in their brief.

Their first contention is that the act in question is unconstitutional for the reason that it is a violation of section 28, article 4, of the Constitution, because the subject of the act is not clearly expressed in its title. That section of the Constitution provides that "No bill . . . shall contain more than one subject, which shall be clearly expressed in its title."

The title to said act reads as follows:

"An act to license manufacturers and rectifiers of intoxicating liquors and wholesalers and retail dealers in such liquors, except wines and spirits produced from grapes or fruits grown in the State of Missouri, and except social, commercial or other clubs, and druggists and pharmacists and licensed dramshop-keepers, and to provide penalties for a violation thereof."

The position of counsel for respondent is that the title of the act mentions but one subject, while the body of the bill includes two; that the title indicates that the act is to prohibit the persons referred to therein from carrying on the callings mentioned, without first obtaining a license therefor, while the act itself not only prohibits the carrying on of the business mentioned in the title, but also provides for the collection of a tax for State purposes.

The position of counsel for appellant is that the act is not broader than the title, and that the latter clearly indicates all that is contained in the former; that is, that the persons mentioned therein are to be prohibited from carrying on the business mentioned without first obtaining a license for that purpose, and that the bill itself carries into effect that idea, with an additional provision fixing a graduated scale of fees, required to be paid in consideration of the licenses, and that the same is germane to the subject stated in the title of the act.

The proper solution of these two contentions practically disposes of this case, because they run side by side through each and all of the many propositions presented by this record; and if the money authorized to be collected by section 5 of the act is a tax upon the property or business mentioned, then the act not only violates said section 28 of article 4 of the Constitution, but it violates several other provisions thereof, as well as some of those of the Constitution of the United States.

If upon the other hand, those moneys are but license fees imposed by the State for the privilege of carrying on the business mentioned, then the fifth section of the act is germane to the subject stated in the title of the bill, and is not therefore obnoxious to section 21 of article 4 of the State Constitution, nor of any of the other sections thereof pointed out

by counsel for respondent, nor of the Constitution of the United States.

From this statement of the positions and contentions of counsel for the respective parties, the importance of a correct determination of the proposition, Is the money mentioned in section 5 of the act a tax, or is it a license fee? is apparent; and we will therefore first address ourselves to that proposition.

Regarding that proposition, counsel for respondent state their position in the following language:

"The provision of the act relative to the granting of licenses is based on the police power of the State, while the provision of section 5 imposing the tax for state purposes is predicated on the taxing power of the State, and this last provision makes the bill a taxing measure instead of a police regulation."

In support of this position, counsel cite the following cases: [Brown v. Maryland, 12 Wheat. 425; Welton v. Missouri, 91 U. S. 275; Cook v. Pennsylvania, 97 U. S. 566; Leloup v. Mobile, 127 U. S. 640-645; Brennan v. Titusville, 153 U. S. 289; State v. Bengsch, 170 Mo. l. c. 109; City v. Ernst, 95 Mo. 360; City v. Spiegel, 75 Mo. 145; City v. Adams, 90 Mo. App. 35; State ex rel. v. Ashbrook, 154 Mo. 375; State ex rel. v. Boyd, 58 L. R. A. 108.

We will briefly review sufficient of these cases to show the reasoning of the courts, in order that we may clearly understand the principle upon which the decisions are based, holding that the acts considered were revenue measures.

In the case of Welton v. Missouri, supra, Welton was convicted of selling certain goods, wares and merchandise, as a peddler, without taking out a license therefor, and paying the license fees in violation of a statute of this State. One of the questions involved in the case, was whether the money required by the statute, to be paid, was a tax or was it a license fee. In passing upon that question, the court said:

"Where the business or occupation consists in the sale of goods, the license tax required for its pursuit is in effect a tax upon the goods themselves. . . . So in like manner (referring to the case of Brown v. Maryland, 12 Wheat. 425), the license tax exacted by the State of Missouri from dealers in goods . . . must be regarded as a tax upon the goods themselves."

The same ruling was made in the case of Cook v. Pennsylvania, 97 U. S. 566. That case involved the validity of a statute imposing a tax on sales made by auctioneers in Pennsylvania and it was held that such a tax was on the goods sold.

In Leloup v. Mobile, 127 U. S. 640-45, the court said: "Of course the exaction of a license tax as a condition of doing any particular business [telegraphy] is a tax on the occupation; and a tax on the occupation of doing a business is surely a tax on the business."

In Brennan v. Titusville, 153 U. S. 289, the court held that an ordinance sought to impose a license tax on certain peddlers, imposed a tax on the goods sold.

The case of State v. Bengsch, 170 Mo. l. c. 109, involved the question of the constitutionality of the Act of April 17, 1901, providing for a State license tax on distilled whisky. It was contended by the State that the act was a licensing measure enacted under the police power of the State. While upon the other hand, the defendant contended that it was a tax on the property. In discussing this question the court on page 109 said:

"But there are other considerations which support the just-expressed view that the act is a revenue measure. In the first place, whenever it is ascertained that a license fee is a tax when imposed mainly for the purpose of revenue, as is abundantly established by authority, it is competent for the courts to make examination and see if, under a mere power to license,

the power of taxation for revenue is exercised.

"In City of St. Louis v. Spiegel, 75 Mo. 145, the litigated ordinance showed that it was imposed for the purpose of revenue, and upon this, this court said: 'In this case it is apparent at first blush that the license fee is imposed for the purpose of revenue. That such fee is also imposed for the purpose of regulation does not deprive it of the salient characteristics of a tax.'

"So also in City of St. Louis v. Weitzel, 130 Mo. 600, we draw the obvious distinction between an exorbitant charge if made by ordinance for affixing garbage plates to each wagon, and an ordinance which authorized only a reasonable charge for so doing; a charge covering the actual expense of each plate; and holding that the latter would be regulation and not taxation, and that the former could not be used as a cloak for the latter, approving the ruling in Spiegel's case, above cited.

"And in Cooley's Const. Lim. (6 Ed.), p. 242, it is said: 'A license is issued under the police power; but the exaction of a license fee with a view to revenue would be the exercise of the power of taxation.' In another work of the same eminent author, it is said: 'The right of any sovereignty to look beyond the immediate purpose to the general effect neither is, nor can be, disputed. The government has general authority to raise revenue and to choose the methods of doing so; it has also general authority over the regulation of relative rights, privileges and duties, and there is no rule of reason or policy in the government which can require the Legislature, when making laws with the one object in view, to exclude from its attention the other. Nevertheless, cases of this nature are to be regarded as cases of taxation. Revenue is the primary object, and the regulation results from the methods of apportionment that are resorted to in obtaining the revenue. Only those cases where regula-

tion is the primary object can be specially referred to the police power.' [Cooley on Taxation (2 Ed.), 587.]

"Under these authorities, every symptom of the questioned act points towards revenue and not towards regulation. The saloon-keeper under this act sells his beverages as was his wont before, without let or hindrance, except on such terms as the act provides. There are no provisions looking to any inspection of the liquors sold across the bar, nor any other safe-guarding of the public morals, but at every turn the act has simply and solely a revenue aspect."

On page 112, the court in speaking of the Welton case said: "6. But pursuing other branches of the subject-matter presented by the record, we come to the ruling made in Welton v. Missouri, 91 U. S. 275; where it was settled that a tax, the amount of which is dependent on the amount of the property sold, is in fact, a tax on the property itself. Such being the case, the act under review must be held to impinge on the provisions of section 3 of article 10 of our Constitution, which declares concerning taxes, that: 'They shall be uniform on the same class of subjects within the territorial limits of the authority levying the tax.'"

In the case of City v. Spiegel, 75 Mo. 145, the court held that a license fee imposed upon keepers of meat shops was a tax and that therefore it must be uniform. On page 146 the court said: "Is, then, the license fee a tax within the meaning of the 3d section, supra? And does the ordinance which authorizes its collection discriminate in favor of some subjects and against others in the same class? That the license fee is a tax when imposed for the main purpose of revenue, is established by abundant authority; and it is competent for the courts to make examination and see if, under a mere power to license, the power of taxation for revenue is exercised. In this case it is apparent at first blush that the license fee is imposed for the pur-

pose of revenue. That such fee is also imposed for the purpose of regulation does not deprive it of the salient characteristics of a tax. . . . In the case of the City of St. Louis v. Green, 70 Mo. 562, we held valid an ordinance which imposed a license tax on vehicles using the streets of that city; but the ordinance then before us for consideration contained nothing looking in the remotest degree to a discrimination between the amounts of taxation imposed upon the 'same class of subjects;' and therein consists the broad difference between the ordinance in Green's case and the ordinance in question.''

In the case of the City of Lamar v. Adams, 90 Mo. App. 35, the ordinance involved levied a license tax of $5 per annum on insurance agents and $15 per annum on insurance companies. In passing upon that ordinance the court, on page 40, said: ''It has been seen that the tax required by said ordinance is a license tax. The imposition of such a tax may be referable to the taxing power, the police power, or both; to the police power alone if the object is merely to regulate and the amount received merely pays the expense of enforcing the regulations, and to the taxing power alone if its main object is revenue. [St. Louis v. Green, 7 Mo. App. 468; s. c. 70 Mo. 562.] We are bound to know that the license fee of fifteen dollars exacted of each insurance company is far in excess of the reasonable expense of enforcement of any regulation, and hence we must conclude that the main object of the tax was revenue. . . . Such license fee is nothing more nor less than an ocupation tax imposed for revenue.''

The case of State ex rel. v. Ashbrook, 154 Mo. 375, involved the constitutionality of the act of May 16, 1899, Laws of 1899, p. 72, known as the Department Store Bill. In discussing the question as to whether the act provided for the imposition of a license fee or tax, the court said, on page 385: ''Courts look be-

yond the mere title of an act to see and determine its real object, purpose and result, and where the power of taxation therein provided for is exercised for the mere purpose of revenue or undue restraint or prohibition, as is most manifest in the act in question, its designation as 'license fee' will not save it from the constitutional restrictions that would apply to it as the imposition of a tax. In no sense can this most extraordinary act be regarded as a police measure, and it consequently does not fall within the protection of the police power. It nowhere attempts to protect any public interest or defend against any public wrong. It shows upon its face that regulation is not its purpose, but that revenue, or undue restriction, in the interest of others not embraced in the class designated, is the aim in view. While a most onerous license fee by name is imposed, no police inspection, supervision or regulation is provided, nor is any standard set for the applicant to establish, or that he agrees to attain or maintain, but any and all persons engaged in the business designated in the act, without qualification or hinderance, may come, and a license on payment of the stipulated sum to the commissioner named in the act, will issue, to do business, subject to no prescribed rule of conduct and under no guardian eye, but according to the unrestrained judgment or fancy of the applicant and licensee. The applicant is simply required to pay his money and take out his license. That is the beginning and the ending of the police supervision and control over him or his business so far as concerns the act in question. In order to sustain legislation of the character of the act in question, as a police measure, the courts must be able to see that its object to some degree tends towards the prevention of some offense or manifest evil, or has for its aid the preservation of the public health, morals, safety or welfare.''

Counsel for appellant do not question the correctness of the rulings of the courts, as announced in the foregoing cases, nor do they question the soundness of the principle underlying them; namely, that a legislative body has no power or authority, under the guise of a police regulation, to tax a legitimate business, in a manner prohibited by the Constitution, State or Federal. But they insist that those cases and that rule have no application whatever to the facts of this case. That they with one exception deal with a legitimate business, in which any one has a natural right to engage, and that while the exception mentioned, namely, State v. Bengsch, 170 Mo. 81, was not of that character, yet the act thereunder consideration, in express terms, imposed a tax upon the property mentioned in the act, and did not undertake to impose a license fee under the police power of the State for the privilege of conducting the business therein mentioned, which otherwise would have been unlawful. Consequently they contend that none of those cases are in point here.

In the presentation of appellant's theory of this question, counsel state that: "In the discussion of the constitutionality of the act, it is necessary to bear in mind the fact, that the traffic in intoxicating liquors in the State of Missouri is declared by law to be illegal. It is not a primary, natural or fundamental right, but is an occupation which no one has the right to pursue without a license." In support of that statement we are cited to the following cases: [Austin v. State, 10 Mo. 591; State v. Hudson, 13 Mo. App. 61; Higgins v. Talty, 157 Mo. 287; State v. Bixman, 162 Mo. l. c. 21, 22, and 23; Black on Intoxicating Liquors, sections 51, 127 and 128; Crowley v. Christensen, 137 U. S. 86.

In the case of State v. Austin, supra, this court, on page 593, in speaking through NAPTON, J., held: "But we are not aware that there is any provision in

our Constitution which would prevent the Legislature from prohibiting dram-selling entirely; nor has the Legislature been prevented from placing such restrictions upon this business, as it may think fit. It has exercised this power not of prohibiting, but of restricting it. It has virtually declared that selling spiritous liquors in quantities less than one quart is illegal, and subjects the seller to heavy penalties, unless he takes the steps required by the law. To sell drams without a license, is not a privilege which either our citizens or strangers can enjoy in this State.'' (For the sake of brevity, in quoting the above, we use the word ''Legislature,'' and verbs applicable thereto, instead of the word ''Legislatures,'' etc., as used by Judge NAPTON.)

In Higgins v. Talty, supra, on page 287, the court said: ''No person has the right to sell intoxicating liquors in this State, as a dramshop-keeper, without having a license from the proper authority authorizing him to do so.''

In State v. Bixman, 162 Mo. l. c. 21, the court said: ''The Legislature, in the act before us, has declared that beer can only be sold or manufactured in this State upon condition that it shall be made of certain cereals only, and shall be inspected, and the inspection fees paid to the State therefor. The defendant asserts that its action in so doing is unconstitutional. We answer that under the Constitution of the State, there is nothing to prohibit the Legislature from suppressing the business absolutely. We stand upon firm ground in asserting this prerogative for the Legislative Department. To deny it is to depart from well settled principles. Since the decision in Austin v. State, 10 Mo. 591, it has been the established law of this State that the right to sell spirituous or intoxicating liquors is not a natural right, but is a calling which no one has the right to pursue, without first having received the privilege or a license so to do, from the

lawful authorities of the State. In that and the subsequent cases of State v. Lemp, 16 Mo. 389, and State v. Searcy, 20 Mo. 489, it was ruled that the State has a right, in the exercise of its police power, to prohibit the sale of intoxicating liquors altogether, or permit their sale, under such regulations as it deems proper. This power was reasserted in State v. Hudson, 78 Mo. 302.''

The foregoing observations are fully supported by sections 51, 127 and 128 of Black on Intoxicating Liquors; and in support of the text, he cites numerous cases from many of the States, and from the Federal courts.

Mr. Justice FIELD, in discussing this same question, in the case of Crowley v. Christensen, 137 U. S. 86, l. c. 91, in speaking for the full court said: ''The police power of the State is fully competent to regulate the business—to mitigate its evils or to suppress it entirely. There is no inherent right in a citizen to thus sell intoxicating liquors by retail; it is not a privilege of a citizen of the State or of a citizen of the United States. . . . The manner and extent of regulation rests in the discretion of the governing authority. That authority may vest in such officers as it may deem proper the power of passing upon applications for permission to carry it on, and to issue licenses for that purpose. It is a matter of legislative will only.''

The same doctrine is fully announced by Black on Intoxicating Liquors, sections 31, 39, 46, 55, 107, 108 and 109. In section 39 the author says: ''If the power of the State to prohibit the manufacture and sale of intoxicating liquors be conceded,—and it is no longer open to question,—it will follow inevitably that the power of the state to regulate the sale of such articles, and to *impose conditions and burdens and responsibilities* upon those who desire to engage in the traffic, is practically unlimited.''

And in State v. Finney, 178 Mo. l. c. 391, this court said: "As to the right of the State to absolutely prohibit the manufacture and sale of intoxicating liquors within its borders, and that such a prohibition is a lawful exercise of its police power, and is not in any way objectionable upon constitutional grounds, is no longer a debatable question."

The quotation last made shows that the principles of law applicable to the retailers are also applicable to the manufacture and wholesalers.

We think that it is fairly deducible from the foregoing authorities, that no one has a natural or primary right to manufacture, sell or refine intoxicating liquors, in any quantity, in this State, but such occupation can only be pursued when the person who desires to engage therein first procures a license from the proper authorities of the State authorizing them to so do.

Those authorities also establish the fact that the liquor traffic is not a lawful business, except as authorized by express legislation of the State; that no person has the natural or inherent right to engage therein; that the liquor business does not stand upon the same plane, in the eyes of the law, with other commercial occupations. It is placed under the ban of law, and it is thereby differentiated from all other occupations, and is thereby separated or removed from the natural rights, privileges and immunities of the citizen.

The foregoing enunciations of the courts are based upon the well known fact that intoxicating liquors and the traffic therein, have brought intemperance, poverty and misery upon many of our citizens, and have been a fruitful source of crime on every hand.

In the discussion, and disposition of this question, sight must not be lost of this distinguishing feature, which as before stated, is peculiar to the liquor traffic.

Bearing in mind the foregoing observations, we will now approach this constitutional question from the standpoint of counsel for the State. They contend that "all statutes regulating the manufacture and sale of intoxicating liquors are enacted by virtue of the police power of the State. Every statute, State and Federal, upon the subject, which has been held constitutional, was sustained upon the ground that it was the proper exercise by the Legislature of the police power of the State."

This contention is not a new one in this and other States of the Union. In the case of State ex rel. v. Hudson, 78 Mo. 302, 1. c. 304, this court, in discussing such license laws, used this language: "Such laws are regarded as *police regulations,* established by the Legislature for the prevention of intemperance, pauperism and crime, and for the abatement of nuisances, and are not regarded as an exercise of the taxing power. 'Pursuits that are pernicious or detrimental to public morals may be prohibited altogether, or licensed for a *compensation* to the public.' "

The same doctrine was announced by the Supreme Court of the United States in the cases commonly known as the "License Cases," reported in 12 Law Edition 1. c. 314. There Mr. Justice GRIER, in speaking for the court, upon this question said: "It is not necessary for the sake of justifying the State Legislation now under consideration to array the appalling statistics of misery, pauperism, and crime, which have their origin in the use or abuse of ardent spirits. The police power, which is exclusively in the States, is alone competent to the correction of these great evils, and all measures of restraint or prohibition necessary to effect the purpose are within the scope of that authority. There is no conflict of power, or of legislation, as between the States and the United States; each is acting within its sphere, and for the public good."

Chief Justice TANEY, in the same case, said: "And if any State deems the retail and internal traffic in ardent spirits injurious to its citizens and calculated to produce idleness, vice, or debauchery, I see nothing in the Constitution of the United States to prevent it from regulating and restraining the traffic, or from prohibiting it altogether, if it thinks proper. . . . Upon that subject, each State must decide for itself."

In the case of State ex rel. v. Mercantile Company, 184 Mo. l. c. 184, the court said: "In the exercise of its police power the State may pass any law which is designed to suppress or punish a wrong, to mitigate an evil, to preserve the peace, health, morals, good order, and the general welfare of the community. For no person has an absolute right to engage in any business which contravenes these purposes."

Mr. BLACK in section 55 says: "It may be regarded as now well settled that the Legislature of a State has full constitutional power to impose a tax upon the business of liquor dealers, wholesalers as well as retailers, and to declare who shall constitute such dealers. And it is to be observed that such an exaction, whether imposed as a license-fee or under the name of a tax, is not primarily designed as a means of raising revenue but as a means of limiting and restricting a traffic which is dangerous to the best interests of the community, and therefore it is not in reality an exercise of the taxing power of the State, but of its police power. For this reason, and also because it is a tax upon the business or traffic rather than upon the property invested in it, the validity of such a law is not to be tested by its conformity to the constitutional restrictions upon the taxing power, further than that it should be uniform in its operation upon manufacturers or *dealers of the same class*. Hence a tax upon the *occupation* of a retailer of liquors, not

236 Sup.—17

being a tax on his stock in trade, like an *ad valorem* assessment, although it may extract more money from some dealers than from others, is not thereby impugned, in respect to its equality and uniformity, in a constitutional sense; and the automatic contrivance known as the 'register' or 'bell-punch' is legitimately furnished at each dealer's expense, to count the drinks he dispenses, and thus adjust the tax he must pay."

The authorities clearly show what the difference is between taxation and the licensing of a buisness or occupation; and that there is no necessary connection between the two. "A business may be taxed and yet not licensed, or it may be licensed and yet not taxed." [Youngblood v. Sexton, 32 Mich. l. c. 425, (Cooley).]

This difference is stated by Mr. Black in his work on Intoxicating Liquors, section 108, in the following language: "If the business is under no legal condemnation, but is open to all persons to engage in, then the imposition of a tax upon it cannot be regarded as a license, because, by universal consent, a license is defined as a permit to do some or engage in some occupation which, without such permission, would be unlawful. A license law, therefore, assumes the illegality of the business, and denounces penalties upon those who pursue it without previously protecting themselves by procuring a license."

And in the same section he defines taxation as follows: "Taxation, on the other hand, assumes the legality of the business for any one who may choose to pursue it, but imposes a burden for the public benefit upon those engaging in it. The case is not altered by the fact that payment of the tax is made a condition precedent to the right to engage in the business."

It should also be observed in this connection that the Act of 1909 does not purport to impose a direct tax upon the property mentioned therein. The most that counsel contend for, in that regard, is that the act imposes an indirect tax upon the property of re-

spondent, by requiring it to pay the fees upon all sales mentioned in section 5 of the act.

In Vol. 8, page 863, of Encyclopedia of Law and Procedure, the words "Police Power" have been defined in the following language: "Police power is the name given to that inherent sovereignty, which it is the right and duty of the government or its agents to exercise whenever public policy in a broad sense demands, for the benefit of society at large, regulations to guard its morals, safety, health, order, or to insure in any respect such economic conditions as our advancing civilzation of a highly complexed character requires."

In discussing this last idea, the Court of Appeals, in the case of State v. Addington, 12 Mo. App. l. c. 221, said: "But from its very nature, the police power is a power to be exercised within wide limits of legislative discretion; and if a statute appears to be within the apparent scope of this power, it would be a usurpation of jurisdiction for the judicial courts to inquire into its wisdom and policy, or to undertake to substitute their discretion for that of the Legislature," citing Cearfoss v. State, 44 Md. 403.

Viewing the act in question in the light of the foregoing authorities, it seems clear to us that the burdens imposed by section five thereof, are license fees imposed upon the respondent for the privilege of manufacturing, rectifying and selling intoxicating liquors, in this State, and without which it would enjoy no such right.

Having thus determined that the burden imposed by said section five is that of a license fee, required to be paid for the privilege of conducting business of respondent and not a tax upon its property, we will return to the original proposition presented: does the act in question violate said section 28 of article 4 of the Constitution?

As before stated, counsel for respondent discuss this question upon the hypothesis that the fees required by section 5 of the act, to be paid, are a tax. That, in our opinion, is an erroneous assumption, and necessarily the conclusions drawn therefrom must also be erroneous.

Upon the other hand, if we consider the burdens imposed by section 5 as fees required to be paid for the privilege of conducting the business mentioned, as previously held, then the act does not violate said section of the Constitution, for the reason, that we have repeatedly held that, "If any matter contained in a statute be objected to, as not referred to in the title, or that the bill contains more than one subject, the objection urged will not be held well taken, if the clause or section to which objection is raised be germane to the subject treated of in the title." [State v. Mead, 71 Mo. l. c. 268; State v. Bixman, 162 Mo. l. c. 19.]

In the case of the City of St. Louis v. Weitzel, 130 Mo. l. c. 616, the court in discussing this question, through SHERWOOD, J., said: "The evident object of the provisions of the organic law relative to the title of an act was to have the title like a guide book, indicate the general contents of the bill, and contain but one general subject which might be expressed in a few or greater number of words. If those words only constitute one general subject; if they do not mislead as to what the bill contains; if they are not designed as a cover to vicious and incongruous legislation, then the title can stand on its own merits, is an honest title and does not impinge on constitutional prohibitions."

This rule was approved by this court in the case of State v. Bengsch, 170 Mo. l. c. 105; and WAGNER, J., in speaking for this court, in the case of State v. Miller, 45 Mo. 495, said: "Now, the nature and object of the act is clearly defined in the title. It is to prevent the issue of false receipts or bills of lading,

and to punish fraudulent transfers of property by warehousemen, wharfingers and others. . . . By a fair construction, it relates to a class of offenses of a kindred character, all connected, blended, and germane. . . . The act shows clearly that its object and aim was to strike at a whole class of cases and remedy an existing evil; and whilst warehousemen and wharfingers are especially enumerated in the title, others are spoken of. . . . A glance at the title would naturally show what was to be found in the law."

And SHERWOOD, J., in State v. Bengsch, 170 Mo. l. c. 106, said: ":The title of an act, under our Constitution, is to be a general indicator of the subject treated of in the body of the act; that subject must, indeed, be clearly expressed in the title, but that title need do no more; it need not descend into details, nor make a digest of the statute, of which it forms the headpiece."

In State v. Brassfield, 81 Mo. l. c. 162, HENRY, J., in speaking for the court said: "Chapter 24 of the Revised Statutes, commencing with section 1227 and ending with section 2119, inclusive, was passed as one bill, and embraces the entire subject of crime and criminal procedure, and there is nothing in the point that the constitutional provision that the subject of each bill be clearly expressed in its title, and that no bill shall contain but one subject, was violated. There are no incongruous matters in chapter 24, and the title of 'Crimes and Criminal Procedure' clearly indicates what it contains. What are crimes and the procedure in criminal cases, are cognate subjects, and the definition of crimes and the procedure against persons accused of committing them may very properly be embraced in one bill."

To the same effect is the case of State v. Bixman, supra; and FOX, J., in speaking for the court in the case of State v. Cantwell, 179 Mo. l. c. 260, said: "It

was not necessary for the lawmaking power, in the title of the act, to designate the purposes of it. The evils it is intended to remedy may be deduced from the provisions of the act itself. That the title should contain but one subject and it should be clearly expressed, by no means can be construed that the title must designate the purpose of the act. The object to be obtained by the provision of the Constitution that there shall be but 'one subject and it shall be clearly expressed,' was 'to prevent surprise upon the lawmakers by the passage of bills, the object of which is not indicated by their titles, and also to prevent the combination of two or more distinct and unconnected matters in the same bill.' ''

In the case of State v. Bengsch, supra, after the court held the act there valid, in so far as the title was concerned, it gave on page 107 an illustration of how the title to that act could have been greatly abbreviated, and still comply with the constitutional requirements. The following is the illustration given: ''An act relating to the manufacture and sale of distilled and vinous liquors.'' The court in discussing that abbreviated title, which did not mention penalties, said: ''Under such a comprehensive title, the mere matter of detail, such as a license tax, etc., would be entirely germane to the title.'' It should be noted, that that title is not so comprehensive as is the title to the act under consideration. That case quotes with approval, the following from Bishop on Statutory Crimes (3 Ed.), sec. 36a: ''The title need indicate the subject only in a general way, without entering into details; and all auxiliary provisions properly attaching to it, and constituting with it one whole, may be embraced within the enactment.''

A similar question was presented and decided in the case of State ex rel. v. Vandiver, 222 Mo. 206. On page 219, the court said: ''In my judgment that act is not in conflict with section 28 of article 4 of the Con-

stitution, which provides that no bill shall contain more than one subject, and that such subject must be clearly expressed in the title of the bill. The title of the bill in question reads as follows: 'An act relating to the Salaries and Compensation of Officers and Agents of Life Insurance Companies.' It is not disputed but what the title of the act clearly indicates that it relates to the salaries and compensation life insurance companies were paying their officers and agents for services rendered and to be performed by them; but the objection lodged against the act is that it contains an additional subject-matter to the one stated in the title of the bill, namely, that a license to do business in this State should not issue to any life insurance company which pays any of its officers or agents more than $50,000 a year for their services. It is true the act contains the prohibitive section, number two, above mentioned, and that no reference thereto is made in the title of the bill to it. If that section constituted a separate and independent subject from the subject stated in the title, then, clearly, the act would be double and unconstitutional, not only on that account, but also for the reason that it is not stated in the title of the act; but if said section two does not contain a separate and independent subject from that expressed in the title of the act, but is germane thereto and naturally relates to the subject therein stated, then the act is single and does not offend against said constitutional provision. [State v. Miller, 45 Mo. 495; Ewing v. Hoblitzelle, 85 Mo. 64; State ex rel. v. Miller, 100 Mo. 439; State ex rel. Kirkwood v. Heege, 135 Mo. 112; Elting v. Hickman, 172 Mo. 237.]'' There were stranger reasons for holding the act there involved to be in conflict with said section 28 of the Constitution, than there is for holding this one to be violative thereof.

If we test the title of this bill by the rule announced in the foregoing cases, it will be seen that it

is sufficiently comprehensive to include each and all of the provisions contained in the body of the bill.

There is but one general subject stated in the title of the act, and that is the licensing of manufacturers and rectifiers of intoxicating liquors, and wholesale and retail dealers therein, providing for a license tax to be paid therefor, and prescribing penalties for its violation. "It need do no more; it need not descend into details, nor make a digest of the statute."

The title is neither misleading nor designed to cover vicious and incongruous legislation. Nor could the lawmakers have been surprised thereby and induced to have passed a measure not indicated by, or germane to, the subject-matter stated in the title.

We are therefore of the opinion, that the act in question is not violative of said section 28 of the Constitution.

II. The constitutionality of the Act of 1909 is also assailed by counsel for respondent as violative of sections 3 and 4 of article 10 of the Constitution of this State.

Their position is thus stated: "The act, being a revenue measure, undertakes to impose taxes on occupations, persons and property which are not uniform on the same class or classes of subjects, in the following particulars, and is therefore violative of said sections of the Constitution."

The "particulars" before mentioned are as follows:

"While the act provides a uniform licensed fee of seventy-five cents for each license issued, it also imposes the following substantial taxes on those whose occupations are subjected to the operations of the act, to-wit:

"(1st). On merchants selling intoxicating liquors, each $100 to $1000 per annum, according to quantity sold.

"(2nd). On sellers of malt or fermented liquors at wholesale where sales are made at other than places of manufacture, each $100, fixed, per annum.

"(3d). On manufacturers of malt or fermented liquors, from $250 to $1000 each per anum, according to quantity produced.

"(4th). On compounders, etc., of spirituous intoxicating liquors, each $250 to $1000 per annum, according to quantity produced.

"(5th). On manufacturers of spirituous intoxicating liquors, each $250 or $500 per annum, according to the quantity produced.

"On the other hand, the act expressly exempts from its operation the following who manufacture or deal in the liquors mentioned, to-wit:

"(a). 'Makers and sellers of wines and spirits made from grapes or fruits grown in the State of Missouri.'

"(b). Druggists and pharmacists who deal in or sell distilled, malt, rectified or fermented liquors or wines.

"(c). Social, commercial or other clubs which sell such liquors or wines."

Said sections 3 and 4 of article 10 of the Constitution read as follows:

"Section 3. Taxes may be levied and collected for public purposes only. They shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and all taxes shall be levied and collected by general laws.

"Section 4. All property subject to taxation shall be taxed in proportion to its value."

In the presentation of these propositions, counsel for respondent, assume, as they did in the discussion of the proposition decided in the previous paragraph, that the burden imposed by section 5 of the act is a tax within the ordinary meaning of that word, and that it undertakes to impose taxes on the occupations,

persons and property therein mentioned, and not a license tax required by the State to be paid for the right and privilege of conducting the business mentioned in the act.    What we said and the conclusions reached in the first paragraph of the opinion virtually disposes of and decides most of the propositions here presented; however, we will consider each of them in detail.

Counsel for respondent insist that it is apparent upon the face of the act, that its primary object is to raise revenue, and for that reasons it violates both of said constitutional provisions.

In support of this contention, counsel for respondent rely chiefly upon the case of State v. Bengsch, supra.    It is insisted that this case has placed its stamp of disapproval upon this and all similar legislation.    By the Act of 1901, the act there involved, an attempt was made to exempt from its provisions, wine-growers of the State, who "sell wine of their own production in any quantity on their own premises."    In discussing that exemption, the court, on page 113, said:   "This tax on liquor brought into this State being of the same amount as that required to be placed on liquor manufactured within our borders, constitutes . . . 'a complimentary provision necessary to make the tax on all liquors sold in the State.' But while this is true, it is equally true that [by] section 24 of the act under review . . . express permission is given to wine-growers of this State 'to sell wine of their own product in any quantity on their own premises.'   Not so, however, with the seller of wine brought or shipped into this State for sale herein, for he has to pay his 'special license tax of ten cents for every gallon,' etc., whether sold on his own premises or elsewhere. . . .   Will it be said that when the Constitution says, 'Taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax,' such rule of uniformity

holds good as to every sort and species of personal property except whiskey? What authority is there for such assertion? We hold there is none." And further, at page 114, the court says: "And the questioned act not only violates the constitutional rule as to uniformity, but also contravenes the rule prescribed by section 4 of the same article, which commands that 'all property subject to taxation shall be taxed in proportion to its value.' Of course, this is not done, and cannot be done, if some property is taxed, and other of like kind, exempted altogether."

Counsel also cite the following cases, in support of this contention: Kansas City v. Grush, 151 Mo. 134; City v. Consolidated Coal Co., 113 Mo. 85; City v. Spiegel, 75 Mo. 145; Am. Union Exp. Co. v. City, 66 Mo. 675; City v. Sternberg, 69 Mo. 289, and see also Judge SHERWOOD's opinion in the case of State ex rel. v. Eby, 170 Mo. l. c. 526; Walling v. Michigan, 116 U. S. 446; Darnell v. Memphis, 208 U. S. 115.

In answer to the foregoing contention of counsel for respondent, counsel for the State insist that "the act is not a *revenue measure*, at all, and therefore does not undertake to impose taxes on occupations, persons and property which are not uniform on the same class or classes of subjects, and does not violate section 3 of article 10 of the Constitution of Missouri, in that regard."

Since these contentions, presented by counsel for the respective parties, involve, and we are thereby called upon to pass directly upon, the question whether this act is a revenue measure, or a license tax, as before suggested, we will briefly consider a few additional authorities differentiating the two propositions, and in so doing, we will almost of necessity be required to repeat some of the things that were said while we were passing indirectly upon this question in paragraph one. We will therefore for the present put aside the contention of counsel for respondent, that

the act is unconstitutional, and dispose of the proposition before stated, after which we will return to the constitutional question passed.

Regarding the question, what is a license, we will let the authorities answer.

"A license is essentially a grant of special privilege to one or more persons, not enjoyed by citizens generally, or, at least, not enjoyed by a class of citizens to which the licensee belongs. A common right is not the creature of a license law." [5 Words and Phrases, p. 4137; State v. Frame, 39 Ohio. l. c. 413.]

"The popular understanding of the word license is a permission to do something which, without the license, would not be allowable, and such is the legal definition." [Youngblood v. Sexton, 32 Mich. 406, l. c. 419.]

"A license is permission granted by some competent authority to do an act which, without such permission, would be illegal." [State v. Hipp, 38 Ohio 199, l. c. 226.]

"A license in its proper sense is a permit to do business which could not be done without the license." [City of Sonora v. Curtin, 137 Cal. 583.]

"The object of a license is to confer a right which does not exist without a license. A license is a privilege granted by the State, usually on payment of a valuable consideration. To constitute a privilege the grant must confer authority to do something which without the grant would be illegal; for if what is to be done under the license is open to everyone without it, the grant would be merely idle and nugatory, conferring no privilege whatever." [Cooley on Taxation (3 Ed.), 1037.]

Black on Intoxicating Liquors says in section 117: "It will be apparent that three leading ideas are involved in the definition of a license under the liquor laws. First, it confers a special privilege or franchise, upon selected persons, to pursue a calling not

open to all. Second, it legalizes acts which, if done without its protection, would be offenses against the statute. Third, it is a privilege granted as a part of a system of police regulation, and herein is distinguishable from taxation. . . . . A license fee is exacted primarily as a means of restricting or regulating a trade, and it continues to be such although, incidentally, it may produce an addition to the public revenue.''

If we read this act in the light of the foregoing definitions of the word ''license,'' it seems clear to us that it does not purport to impose a tax upon any occupation, person or property, but is simply an act requiring all persons who wish to engage in the business therein mentioned, to first procure a license from the proper authorities granting them the permission to do so, and at the same time imposes a license fee which must be paid by each and all licensees, in consideration of the right and privilege so granted. Such licenses must be actually paid for, or agreed to be paid for (according to the provisions of the act under which they are issued), by the applicant therefor, before the same can lawfully issue. That agreement may be in express terms, or it may be implied from the acceptance of the license, which in contemplation of law, has the act under which it is issued written therein, and constitutes a part thereof. That being indisputably true it seems clear to us, that it would be a physical impossibility, as it were, to hold that such consideration so required to be paid for said privilege, which evidenced by the license, is a tax upon the occupation, person or property mentioned therein, for the obvious reason that there could be no such lawful occupation, as shown by the authorities previously cited, until the license had been issued and paid for before its issuance; and if there could be no such business in existence until after the issuance of the license, then it is self-evident that no one could engage therein until

after its issuance; and likewise no property could be employed in a business before the business itself is established.

It cannot, therefore, be logically held that such a tax is a tax upon the occupation, person or property mentioned or referred to in the act. But upon the other hand, if we consider and hold that said tax, or fee, required by the act is to be paid to the State as a consideration for the privilege of engaging in the business mentioned therein, then we will be relieved of the anomaly of holding that a business, a person or the property employed therein can be, and is taxed before the business exists, before the party could engage therein, and before the property could be employed therein.

Counsel for respondent lay much stress upon the fact that section 5 of the act provides that "there shall be levied a tax for State purposes," etc., and that the sum produced thereby will be very large.

It is wholly immaterial what the Legislature called the money which it requires applicants for licenses to pay, for the privileges granted thereby, or what the aggregate amount thereof may be; but the real question is: what is it in fact?

GANTT, J., in the case of State v. Bixman, 162 Mo. 1, in discussing this same question, in speaking for the court, on page 24, said: "It is immaterial by what name it is called, and, being such, it is not a *tax upon property,* within the meaning of our Constitution, and hence, the objections that it is not levied according to the value, and is not uniform, and exceeds the constitutional rate, must fall with the proposition to which they are corollaries." In the same case, GANTT, J., in considering the constitutionality of the Beer Inspection Law, where it was contended that the burden imposed thereby was a general tax, on page 20, said:

"The insistence of the learned counsel for defendant is that it is an act to levy a general revenue or property tax, and not a police regulation. In arriving at this conclusion, great stress is laid upon the fact that a large revenue—an amount approximating a half million dollars—is covered into the State Treasury, together with the fact that the statute requires all the fees arising under it to be paid directly into the Treasury, and that the salaries of the inspectors and his deputies shall be paid out of a distinct appropriation for that purpose. Having satisfied themselves that it is simply a revenue tax, and the law a method of raising revenue only, counsel proceed to occupy two more advanced positions, to-wit, that if the Legislature intended by these inspection fees to raise revenue, the law cannot stand, and that the Legislature has not an arbitrary power to prohibit the sale of beer. Both of these propositions we answer in the negative, upon long-established principles.

"As to the first, this court has answered in no uncertain language. In State v. Hudson, 78 Mo. 305, the court said: 'It does not follow because the license fee is large, or because it may become a part of the public revenue, that it is therefore a tax. Many fines, penalties and forfeitures become a part of the public revenue of the State that are not derived from taxation. The disposition of the fund derived from the license fees does not necessarily determine the character of the fees.' We may add that when the subject is within the police power, as we think we shall be able to show this is, then the *extent* to which it shall be exercised, and the *regulations* to effect the desired end, are matters within the *legislative discretion*. The fact, then, that a large revenue results from this price which the Legislature requires of the brewers for the privilege of carrying on their business in this State, does not establish that it is a simple revenue tax under the guise of inspection merely. . . . .

"The policy of the law is one thing; the consti-tuitonal power of the General Assembly to enact it is an entirely different thing. . . . The Legislature, in the act before us, has declared that beer can only be sold or manufactured in this State upon condi-tion that it shall be made from certain cereals only, and shall be inspected, and the inspection fees paid to the State therefor. The defendant asserts that its action in so doing is unconstitutional. We answer that under the Constitution of the State there is noth-ing to prohibit the Legislature from suppressing the business absolutely. We stand upon firm ground in asserting this prerogative for the legislative depart-ment. To deny it is to depart from well-settled prin-ciples. Since the decision in Austin v. State, 10 Mo. 591, it has been the established law of this State that the right to sell spirituous or intoxicating liquors is not a natural right, but is a calling which no one has the right to pursue without having first received the privilege or a license so to do from the lawful au-thorities of the State. In that and the subsequent cases of State v. Lemp, 16 Mo. 389, and State v. Searcy, 20 Mo. 489, it was ruled that the State has a right, in the exercise of its police power, to prohibit the sale of intoxicating liquors altogether, or permit their sale, under such regulations as it deems proper. This power was reasserted in State v. Hudson, 78 Mo. 302; and it was further held that the high license fees imposed by the Act of March 24, 1883, were not 'taxes,' within the meaning of sections 1, 3 and 10 of article 10 of our Constitution, but a price paid for the privi-lege of doing a thing the doing of which the Legis-lature has a right to prohibit altogether."

Counsel for appellant also lay much stress upon the fact that the act in question contains but few, if any, regulation provisions, and from that premise they argue that it is not a police regulation, but is a revenue measure. The liquor business in this State

has been outlawed by legislation, and it can only be conducted lawfully by securing a license from the State authorizing it to be done. That alone is a police regulation. It is not a contract between the State and the license, and the State may revoke it at pleasure.

In discussing this question, Mr. Justice BRADLEY, in speaking for the Supreme Court of the United States, in the case of Boston Beer Co. v. Massachusetts, 97 U. S. 1. c. 32, said: "If the public safety or the public morals require the discontinuance of any manufacture or traffic, the hand of the Legislature cannot be stayed from providing for its discontinuance, by any incidental inconvenience which individuals or corporations may suffer. All rights are held subject to the police power of the State. . . . Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health, and property of the citizens, and to the preservation of good order and the public morals. The Legislature cannot, by any contract, divest itself of the power to provide for these objects. They belong emphatically to that class of objects which demand the application of the maxim *salus populi suprema lex;* and they are to be attained and provided for by such appropriate means as the legislative discretion may devise. That discretion can be no more bargained away than the power itself."

And this court in the case of State v. Hudson, 78 Mo. 302, and reaffirmed in the case of State v. Bixman, said: "Such laws [i. e., license laws] are regarded 'as police regulations, established by the Legislature for the prevention of intemperance, etc.,' and are not regarded as an exercise of the taxing power. 'Pursuits that are pernicious or detrimental to

236 Sup.—18

public morals may be prohibited altogether, or licensed for a compensation to the public.'"

The following authorities announce the same principles: Ex parte Tuttle, 91 Cal. 589; State v. Thompson, 160 Mo. 333; State ex rel. v. Donovan, 20 Nevada 75; Cooley on Constitutional Limitations (6 Ed.), p. 609; Cooley on Constitutional Limitations (3 Ed.), p. 582; L'Hote v. New Orleans, 177 U. S. 596; Crowley v. Christensen, 137 U. S. 86.

When we bear in mind the foregoing idea, that the liquor traffic in this State has no legal rights, save and except those expressly granted by license and the statute under which it is issued, then we can more clearly see that the State may impose such conditions, burdens and regulations as it may deem wise and proper, and no one who engages therein has a right to complain thereof.

The authorities fully support the proposition that the imposition of the license tax alone is the exercise of the police power, and that the person who desires to engage in the liquor traffic must pay, or agree to pay that tax, before the license will issue, and the question of regulation is foreign to the subject. The manner and extent of the regulation rests exclusively in the discretion of the State. The regulations may be much, little or none, as the Legislature may deem wise, and this is the first time I ever heard the validity of such a law being questioned by those engaged in the liquor business, because it provides for slight rather than stringent regulation.

In the case of Crowley v. Christensen, 137 U. S. 86, l. c. 91, the Supreme Court of the United States, in discussing this question, said: "The sale of such liquors in this way has therefore been, at all times, by the courts of every State, considered as the proper subject of legislative regulation. Not only may a license be exacted from the keeper of the saloon before a glass of his liquors can be thus disposed of, but

restrictions may be imposed as to the class of persons to whom they may be sold, and the hour of the day and the days of the week on which the saloons may be opened. Their sale in that form may be absolutely prohibited. It is a question of public expediency and public morality, and not of Federal law. The police power of the State is fully competent to regulate the business—to mitigate its evils, or to suppress it entirely. There is no inherent right in a citizen to thus sell intoxicating liquors by retail; it is not a privilege of a citizen of the State or of a citizen of the United States. As it is a business attended with danger to the community it may, as already said, be entirely prohibited, or be permitted under such conditions as will limit to the utmost its evils. *The manner and extent of regulation rest in the discretion of the governing authority.* That authority may vest in such officers as it may deem proper the power of passing upon applications for permission to carry it on, and to issue licenses for that purpose. *It is a matter of legislative will only.* As in many other cases, the officers may not always exercise the power conferred upon them with wisdom or justice to the parties affected. But that is a matter which does not affect the authority of the State; nor is it one which can be brought under the cognizance of the courts of the United States.''

Judge GANTT, in the case of State v. Bixman, 162 Mo. 1. c. 23, quoting approvingly from the language of Chief Justice DIXON in the case of State v. Ludington, 33 Wis. 107, said:

'' 'And herein, as this court conceives, consists the chief defect and fallacy of the position assumed and argued with so much ingenuity and research by the learned counsel *for the respondent. They forget, as it appears to us, that the subject with which we are dealing is not one of those pertaining to the primary and fundamental rights of the citizen, and as to which

no unlimited control has been vested in the Legislature. They seem to overlook this principal ground of distinction, and argue as if the action of the Legislature was an infringement of the natural and inalienable rights of the citizen, declared and guaranteed by the Constitution, instead of the exercise of a discretionary power, against which no limit has been set by that instrument. And this, we think, is the very turning point of the controversy, namely, that the Legislature may grant or withhold authority to sell at its pleasure, and, granting such authority, it is held by the licensee at the mere pleasure or grace of the body granting it. It is held by him, not as a primary and absolute right, but as a favor, which, like all favors, must be received upon such terms and conditions, and subject to such burdens and inconveniences, as the donor thinks proper to impose and the donee elects to accept. . . . . . Unlike other trades and employments which it is the right of the citizen to pursue, undisturbed by arbitrary legislative interference and control, the person who engages in this must, within the limitations above indicated, do so subject to such disadvantages as may be presented by the law-making power which authorizes it.' . . .

"The doctrine that inspection fees legitimately cannot exceed the proper cost of inspection has no application to the facts of this case. That rule applies to those callings which the State may properly regulate, but has no power absolutely to suppress; but even in the latter case it is not restricted to the mere cost of inspection. [City of St. Charles v. Elsner, 155 Mo. 671.]

"Having thus indicated the fundamental principles which must control in our construction of the Act of May 4, 1899 [Beer Inspection Law], we are prepared to answer the question propounded as to the nature of the exaction prescribed by the statute. In our opinion, it is a police regulation, imposing condi-

tions upon the business of manufacturing and selling beer and malt liquors in this State, which business the State may absolutely suppress, or permit upon such terms as the Legislature may prescribe. We construe the act in view of all its parts, and in connection with other license laws of this State, and hold that the fee exacted is the price which the State demands for the privilege of doing the business of brewing and selling beer and malt liquors in this State, and it is immaterial by what name it is called, and, being such, it is not a tax upon property, within the meaning of our Constitution, and hence the objections that it is not levied according to value, and is not uniform, . . . must fall.''

The conclusion to be drawn from these authorities is irresistible that the act in question is not a revenue measure, or a tax upon occupations, persons or property within the meaning of sections 3 and 4 of article 10 of the Constitution, but upon the other hand, is a license tax or fee required by the State to be paid by those who wish to engage in the liquor business for the license and privilege of doing so; and that tax or fee may be large or small as the Legislature of the State may deem proper to impose. And likewise the Legislature may impose upon the business much or little regulation.

And in this connection it should be borne in mind that the persons to whom this act applies do not need the same degree of regulation, as the retailers of intoxicating liquors do. There is but little, if any, drinking about the premises of the former, and consequently there is but little, if any, intoxication there. While as to the latter, their places are tippling houses, the places where the major portion of intoxication occurs, and from which flows the principal part of the intemperance, debauchery, poverty and crime of which the books speak. Such business requires a high degree of supervision and regulation.

This undoubtedly had much to do with the degree of regulation prescribed by the act for the occupations therein mentioned, but did not diminish in the least the authority and power of the Legislature to impose upon the former, by way of a license fee, a part of the cost and expense the State is put to, by reason of the intemperance, poverty, and crime that flow from intoxicating liquors, and the traffic therein.

Returning to the constitutional question before passed.

Counsel challenge the constitutionality of the Act of 1909, for the reason that it exempts from its operation wines and spirits made from grapes and fruits grown in this State; and because it exempts therefrom druggists, dramshop-keepers and certain clubs named therein; also for the reason that the act prescribes a graduated scale of fees to be paid by the parties mentioned therein, according to the quantity and kind of business done.

We will consider these objections in the inverse order in which they are stated.

The last objection made to the validity of the act, is that the graduated scale of fees are taxes, and are invalid for the reason that they are not levied on any principle of equality or uniformity, and consequently violate said section 3 of article 10 of the Constitution. The contention is that the fees are invalid because they are required to be paid in proportion to the kind and volume of business transacted and not upon a uniform or flat basis, regardless of the business transacted.

This question was presented to this court and decided adversely to respondent's contention, in the case of State v. Bixman, supra. On page 30, Judge GANTT, in speaking for the court, said: "But we hold that it is competent for the Legislature to fix the amount in proportion to the business done or the output sold as in this case. That is a matter for the lawmaking

power to determine, and, as we have already said, it does not follow that a license must issue for a fixed period.''

And the Supreme Court of the United States, in the case of Clark v. Titusville, 184 U. S. 1. c. 330, said: ''Classification according to the amount of business done, has been frequently recognized by the Federal courts.''

In the latter case, the court held that an ordinance imposing a license tax upon merchants by which they were divided into classes according to the amount of their sales, each class including all whose sales ranged between a certain minimum and maximum amount, does not violate the equality clause of the Constitution of the United States, although the result would be to make persons in different classes pay different rates, and to make those in the same class pay a different ratio if the amounts of their sales differed. If that rule is valid when applied to ordinary business vocations, then for stronger reasons it must be held to be valid when applied to the liquor business.

Black on Intoxicating Liquors, announces the same rule in section 232.

We therefore hold that the act in this regard does not violate section 3 of article 10 of the Constitution.

The constitutionality of the act is also assailed because it exempts from its operation druggists, dramshop-keepers and social and business clubs.

Druggists, dramshop-keepers and the clubs here mentioned are classified by other provisions of our liquor laws, and the two former are licensed to sell liquors under other statutes of the State, for which they pay the required license fees. And as to the clubs, they neither manufacture, sell, nor rectify any kind of liquors; the members thereof buy and drink their own liquors.

Druggists can only sell liquors, wines, etc., for medicinal or sacramental purposes, and dramshop-

keepers retail their liquors in small quantities, usually by the glass or drink, and consequently they require more stringent regulation than does the manufacturer, wholesaler or rectifier.

Clearly these are reasonable and proper classifications, especially when we consider the fact that all of them hold their licenses purely as a matter of grace from the State.

In speaking of a like question, Judge GANTT, in the Bixman case, on page 35, said: "Holding, as we do, that this is not a property tax, but a proper police regulation of an otherwise inhibited article, . . . it is not open to the objection that it exceeds the rate of property taxation; but counsel urge another view, and it is this: Treated as a charge or fee, they say the exaction is not uniform, because it is imposed upon the business of those who manufacture and sell beer and malt liquors only, and not upon the business of all who deal in intoxicating liquors. In other words, the objection is that in segregating the manufacture and sale of beer and malt liquors the Legislature has made an arbitrary classification, and thus unjustly imposes a burden upon this particular kind of business, when, if imposed at all, it should be upon the business of all who are engaged in the manufacture and sale of intoxicating liquors of every kind; that it is class legislation. To this we do not assent. The State is under no obligation to permit the manufacture of any kind of intoxicating liquors. It may impose one kind of restrictions upon one kind of intoxicants and another kind upon another sort."

Again on page 37, quoting from Senior v. Ratterman, 44 Oh. St. 661, he says: " 'The law, as to its taxing features, operates upon a business, and not upon property, within the meaning of the section referred to, and hence is not required to be uniform to all forms of traffic or to all classes.' A difference was made

between a manufacturer and a wholesaler, and it was held proper classification."

A reasonable classification of the persons and the subjects to which an act applies and its uniform application to each of said classes is all that the State or Federal Constitution requires. [State ex inf. v. Standard Oil Co., 218 Mo. 1. c. 369, and cases cited; American Sugar Refining Co. v. Louisiana, 179 U. S. 1. c. 92.]

This classification clearly conforms to that rule, and we therefore hold that the act does no violence to the State or Federal Constitution in that regard.

It is finally insisted that this act violates section 3 of article 10 of the Constitution, for the reason that it exempts from its operation persons who sell intoxicating liquors of any kind in any quantity made of grapes or fruits grown in this State, and is not therefore uniform in its application.

This precise question was presented to the Supreme Court of Iowa, in the case of State v. Stucker, 58 Iowa, 496, and on page 498, the court said:

"It is very clear that if the regulation or prohibition of the sale of intoxicating liquors is a police power, which may be exercised by the State and without interfering with the prerogative of Congress to regulate commerce among the States, the act in question is not repugnant to article 1, section 8, of the Federal Constitution. Counsel for appellant cites Ward v. Maryland, 12 Wall. 418; Welton v. Missouri, 91 U. S. 275, and other cases in the same court, which hold that a license tax cannot be laid upon the sale of the products of other States while the same products within the State are exempted. These cases are founded upon a different principle. They treat of regulations of commerce proper, and not with mere police regulations.

"II.  If the State has the power as a police regulation to prohibit the sale of intoxicating liquors, it may, in its discretion, prohibit the sale of one kind of liquor and allow the sale of another kind.  It may say that certain wines may not be sold, and that certain other wines may be sold.  Because the sale of all things which may be deleterious to the public is not prohibited, is no good reason why the sale of such as are prohibited is invalid.  And because the sale of wines manufactured from fruit grown in this State is allowed, and the sale of wines manufactured from fruit grown in Illinois is prohibited, is no invasion of the 'privileges and immunities of citizens of' Illinois; because this State in the exercise of its police authority has the power to determine what kind of intoxicating liquors it will prohibit the sale of, and what kind it will allow.

"We think it is plain that the section of the statute under consideration is not repugnant to article 4, section 2, of the Federal Constitution."

The same question was presented to the Supreme Court of Ohio, in the case of McGuire v. State, 42 Ohio St. 530.  The court, on page 535, in speaking through JOHNSON, C. J., said:

"It is settled, that a State in the exercise of its power of taxation cannot impose burdens upon the products of other states imported into the State for sale more onerous than is imposed upon the same kind of articles produced within the State, nor discriminate against citizens engaged in selling them.  [Welton v. Missouri, 91 U. S. 275; Guy v. Baltimore, 100 U. S. 434; Tiernan v. Rinker, 102 U. S. 123.]  These cases relate to the taxing power of the State, and not to its police power.

"Tiernan v. Rinker is much relied on in the case at bar.  It related to the validity of an act by the State of Texas, regulating taxation, which provided for the levy and collection of a tax upon the occupa-

tion of selling intoxicating liquors, but excepted from such tax 'any wine or beer manufactured within this State.' Following Welton v. Missouri, it is held that this was a discrimination in favor of domestic and against foreign made wines, and therefore this proviso or exception was void. Here was a direct discrimination against a specific article of legitimate commerce.

"The statute under consideration makes no such discrimination. Wines imported into this State are on an equality with wines made in Ohio. Wherever the article is manufactured, whether within or without the State, it is equally unlawful to sell it, contrary to the act. Wine wherever manufactured, whether within or without the State and imported, if made of the pure juice of the grape, cultivated within this State, is excepted from the operation of the law. There is no restraint or burden placed upon the importation or sale of wines, as an article of traffic. This statute, after the wine has become a part of the general property of the State, undertakes to restrain the retail traffic therein as a beverage. This we think may be done under the authority conferred by the police power, without at all interfering with the freedom of transportation into the State, or a sale thereof by the importers. It is merely a regulation of the internal retail traffic in an article, which the lawmaking power regards as injurious, after it has become part of the mass of property in the State.

"That this law discriminates in favor of pure wine, made from the juice of grapes cultivated in this State, is clear, but it is not an interference with or burden on commerce. In other words, it is a discrimination against adulterated wine, without regard to where it is manufactured.

"In coming to this conclusion we are not unmindful of the importance and difficulty of the question, but since this act has been enforced, and has stood un-

challenged, on this ground, for near thirty years, it would require a case clear beyond controversy to authorize us now to declare it unconstitutional.    If, however, we are in error in this, and the case of Tiernan v. Rinker is sound, then the result is, that the proviso only is void, and a sale of the excepted liquors does not relieve the plaintiff in error.  Had he proved on the trial that he sold wine manufactured from the pure juice of native grapes, it would have been in violation of the valid clause of the statute.''

In the case of the American Sugar Refining Company v. Louisiana, 179 U. S. 89, a statute of Louisiana imposed a license tax upon persons and corporations carrying on the business of refining sugar and molasses, in that State, but exempted from its operation planters and farmers grinding and refining their own sugar and molasses.  The plaintiff contended that by reason of the exception sugar refiners were denied the equal protection of the law.  The Supreme Court of the United States in denying that contention on pages 92 and 93 said:

''The act in question does undoubtedly discriminate in favor of a certain class of refiners, but this discrimination, if founded upon a reasonable distinction in principle, is valid.  Of course, if such discrimination were purely arbitrary, oppressive or capricious, and made to depend upon differences of color, race, nativity, religious opinions, political affiliations or other considerations having no possible connection with the duties of citizens as taxpayers, such exemption would be pure favoritism, and a denial of the equal protection of the laws to the less favored classes. But from time out of mind it has been the policy of this Government, not only to classify for purposes of taxation, but to exempt producers from the taxation of the methods employed by them to put their products upon the market.  The right to sell is clearly an incident to the right to manufacture or produce, and

it is at least a question for the Legislature to determine whether anything done to prepare a product most perfectly for the needs of the market shall not be treated as an incident to its growth or production. The act is not one exempting planters who use their sugar in the manufacture of articles of a wholly different description, such as confectionery, preserves or pastry, or such as one which should exempt the farmer who devoted his corn or rye to the making of whisky, while other manufacturers of these articles were subjected to a tax. A somewhat different question might arise in such case, since none of these articles are the natural products of the farm—such products only becoming useful by being commingled with other ingredients. Refined sugar, however, is the natural and ultimate product of the cane, and the various steps taken to perfect such product are but incident to the original growth.

"With reference to the analogous right of importation, it was said by this court at an early day in Brown v. Maryland, 12 Wheat. 419, that the right to sell was an incident to the right to import foreign goods, and that a license tax upon the sale of imported goods, while still in the hands of the importer in their original packages, was in conflict with that provision of the Constitution which prohibits a State from laying an impost or duty upon imports.

"Congress, too, has repeatedly acted upon the principle of the Louisiana statute. Thus, after having imposed by Act of August 2, 1813, a license tax upon the retailers of wines and spirits, for the purpose of providing for the expense of the war with Great Britain, it was further enacted by an Act of February 8, 1815, c. 40, 3 Stat. 205, that it should not be construed 'to extend to vine dressers who sell at the place where the same is made, wine of their own growth, nor shall any vine dresser for vending solely where the same is made, wine of his own growth, be

compelled to take out a license as a retailer of wines.'
So, too, in the Internal Revenue Act of July 1, 1862,
c. 119, 12 Stat. 432, a license tax was imposed (Sec.
64) upon retail dealers in all goods, wares and mer-
chandise, but with a proviso, in section 66, that the
act should not be construed 'to require a license for
the sale of goods, wares and merchandise made or
produced and sold by the manufacturer or producer
at the manufactory or place where the same is made
or produced; to vintners who sell, at the place where
the same is made, wine of their own growth; nor to
apothecaries, as to wines or spirituous liquors which
they use exclusively in the preparation or making of
medicine for lame, sick or diseased persons.' Another
paragraph of the same section (64) exempts distillers,
who sell the products of their own stills, from a tax as
wholesale dealers in liquors. While no question of
the power of Congress is involved, these instances
show that its general policy does not differ from that
of the act in question, and that the discrimination is
based upon reasonable grounds. So, too, this court
has had repeated occasion to sustain discriminations
founded upon reasons much more obscure than this.''

Laws similar to those above mentioned are still in
force and upon the statutes of the United States. Sec-
tion 3246 of Compiled Statutes, U. S. 1901, regard-
ing the assessment and collection of special taxes,
reads as follows: ''Nothing in this chapter shall be
construed to impose a special tax upon vintners who
sell wine of their own growth, or manufacturers who
sell wine produced from grapes grown by others, at
the place where the same is made or at the general
business office of such vintner or manufacturer: Pro-
vided, That no vintner or manufacturer shall have
more than one office for the sale of such wine that shall
be exempt from special tax under this act; nor shall
any special tax be imposed upon apothecaries as to
wines or spirituous liquors which they use exclusively

in the preparation or making-up of medicines.''
The Dramshop Act of this State contains a simi-
lar exemption. Section 7221, R. S. 1909, in so far as
is here material, reads: ''This article shall not be
construed so as to affect the right of a merchant to
sell intoxicating liquors . . . nor as affecting the
right of wine growers to sell wine of their own pro-
duction in any quantity on their own premises.''

I have examined the liquor laws of a number of
the States, and have failed to find a single one which
does not contain a section or clause making similar
exemptions in favor of wines and spirits produced
from grapes or fruits grown in the respective States.
And I venture the assertion, that there are but few,
if any, of the statutes of the various states of the
Union, which license the liquor traffic, but what con-
tain similar exemptions to those before mentioned;
and in each instance the exemption is as old as the
Dramshop Law itself.

The exemption contained in our Dramshop Act
has been before this Court and the Court of Appeals
in several cases, but the constitutionality of the act
has never been challenged upon that account, so far
as I have been able to learn.

This exemption, contained in the laws of the va-
rious States and the United States is a strong, though
probably not a controlling reason for holding that the
classification thereby made, if classification it is, is
reasonable, and just, and does not violate the equality
clause of the State or Federal Constitution.

In the case of Williams v. Fears, 179 U. S. 270,
by a general revenue act of Georgia, a specific tax
was levied upon many occupations, including that of
''emigrant agent,'' meaning a person engaged in hir-
ing laborers, in the State, to be employed beyond its
limits. Williams, the agent, contended that the act
was unconstitutional because: first, it interfered with
his freedom of transit, and right to contract, so as to

violate the Federal Constitution, and, second, because the act denied to him the equal protection of the laws. In holding adversely to those contentions the court on page 275, in discussing the latter proposition, said: "Nor does it appear to us that the objection of unlawful discrimination is tenable. The point is chiefly rested on the ground that inasmuch as the business of hiring persons to labor within the State is not subjected to a like tax, the equal protection of the laws secured by the Fourteenth Amendment is thereby denied. In Shepperd v. Commissioners, 59 Georgia, 535, approved and followed in this case, the Supreme Court of Georgia decided that the act of 1876, which required a license as preliminary to carrying on this business, was not unconstitutional on this ground, for the reason that it did not appear that hiring for internal employment had become a business in Georgia, or was pursued as such by any person or persons. And for the further reason that the State could properly discriminate in its police and fiscal legislation between occupations of similar nature but of dissimilar tendency; between those which tended to induce the laboring population to leave, and those which tended to induce that population to remain. We are unable to say that such a discrimination, if it existed, did not rest on reasonable grounds, and was not within the discretion of the State Legislature. [American Sugar Refining Company v. Louisiana, ante, 89, and cases cited.] In fine, we hold that the act does not conflict with the Fourteenth Amendment in the particulars named."

In the case of Cox v. Texas, 202 U. S. 446, the statutes of the State provided for taxes on sellers of spirituous, vinous or malt liquors, or medicated bitters. They required an application for a license, giving details, a payment of the annual tax as a condition of obtaining the same, and the giving of a bond, etc. The statute also provided that "the provisions of this chapter shall not apply to wines produced from

grapes grown in this State, *while the same is in the hands of the producer or manufacturer thereof.*" Mr. Justice HOLMES, in speaking on page 450, for the court, said:

"The main argument addressed to us was rested on the notion that the statutes discriminate unconstitutionally between two classes of persons in the State, naturally existing there, as in Connolly v. Union Sewer Pipe Co., 184 U. S. 540, there was a discrimination with regard to trusts in favor of producers and raisers of agricultural products and live stock. This argument seems to us a fallacy. Farmers and stock raisers are classes naturally existing in the community, carrying on distinct callings and not likely to be engaged in anything else. Hence, although farmers and stock raisers equally with others were prohibited from forming trusts for other purposes, to permit them to form trusts in their regular business was practically and in fact to discriminate between two classes and others. The case was discussed throughout on the footing of classification. But, so far as we know, there is no natural distinction of classes among liquor sellers—one class selling their own domestic wines alone, another selling all intoxicants except domestic wines. The statutes regulate the doing of certain things, which presumably all liquor sellers would prefer to be free to do. Therefore whatever other objection there may be to them they do not deny the equal protection of the laws by forbidding without justification to one what they permit to another class.

"There is one slight qualification necessary to what we have said. It is true that there is granted to the producers and manufacturers of wine from grapes grown in Texas an immunity in respect of that wine which is not granted to other sellers of the same wine. To that extent, but to that extent alone, favor is shown to a class. But this is not the class discrimi-

236 Sup.—19

nation put forward and insisted upon. The attack is not mainly on the distinction between producers and other sellers of domestic wine, but upon that between those producers and the sellers of other wine. The latter, as we have said, is not a true class distinction. Whether there is a difference in the scope of a State's general power to legislate and its power to tax or not (Kidd v. Pearson, 128 U. S. 1, 26; Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 562, 563), the former does not need an extended defense so far as the Fourteenth Amendment alone is concerned. See American Sugar Refining Co. v. Louisiana, 179 U. S. 89; Reymann Brewing Co. v. Brister, 179 U. S. 445; St. John v. New York, 201 U. S. 633.''

In this connection it should be noted that the act here in question cannot discriminate against any class of persons, for two reasons: first, because for the reason stated in the Cox case, just considered, namely, that there is in this State ''no natural distinction of classes among liquor sellers, one class selling their own domestic wines, alone, another selling all intoxicants except domestic wines;'' and, second, because this act does not require any one to pay the license tax mentioned therein, on wines or spirits made from grapes or fruits grown in this State. This act in that regard reads as follows: Section 1. ''It shall be unlawful for any person, firm or corporation to manufacture, rectify, sell or expose to sale in this State, intoxicating liquors of any kind in any quantity, except wines or spirits made from grapes or fruits grown in this State, without first taking out a license under the provisions of this act.''

This act differs from the Texas and Louisiana acts before mentioned, in that they exempt the wine and sugar mentioned therein, from the tax thereby imposed, in favor of the resident producer, but not in favor of any one else.

It was because of this exemption in favor of the class of resident producers, that caused the court in that case to qualify the general rule announced therein; but no such classification is made by the act in question, and for that reason the qualification made in that case cannot apply here. Moreover, this act, as before stated, does not by the exemption create any class, as was done by the acts before mentioned, but exempts wines and spirits produced from grapes. and fruits grown in this State, from all the taxes men- tioned therein, in favor of all who may choose to deal therein.

Any one, a resident or non-resident, wholesaler, or retailer, producer or consumer, may manufacture, rec- tify or sell at wholesale or retail such wines and spir- its without taking out a license under this act, and without paying the license fees therein mentioned.

But the question as to whether or not this act by virtue of the exception discriminates in favor of domestic wines and spirits manufactured from grapes and fruits grown in this State, and against those pro- duced in other States, and thereby interferes with in- terstate commerce, presents quite a different propo- sition, which will receive consideration at the proper time and place.

The same principle that is announced by the fore- going cases is recognized in the following cases: State v. Bixman, 162 Mo. 1, l. c. 35 to 41; Kidd v. Ala- bama, 188 U. S. l. c. 732; Cargill v. Minnesota, 180 U. S. 452; Armour Packing Co. v. Lacy, 200 U. S. 226; Atkin v. Kansas, 191 U. S. 207.

The authorities reviewed, among other things, es- tablished the three following propositions: First, That the burdens imposed by section five of the act in question are not taxes upon occupations, persons. or property within the meaning of the Constitution. Second, That the class of cases which hold that a statute which imposes a tax, under the taxing power

of the State, upon persons, property or any lawful business, is unconstitutional, if it is not uniform in its operation; and third, That where a person has no natural, absolute or lawful right to engage in a business, and can only do so under a license from the State, the State may grant or withhold such license as the Legislature may deem wise and proper, and if granted it may do so upon such terms and conditions as the lawmaking power may impose (not inconsistent with the State or Federal Constitution) including a requirement that the applicant therefor shall pay or agree to pay the license fees, in consideration of the license, or right, to conduct said business; and that said fees are in no sense a tax upon the business licensed, nor upon the person or property engaged therein.

Bearing these three propositions in mind, we will try to reconcile the apparent conflict, pointed out by counsel, between the cases of State v. Bengsch, supra, Tiernan v. Rinker, 102 U. S. 123, and those announcing a similar doctrine upon the one hand, and those upon the other hand like the cases of State v. Stucker, 58 Iowa, 496; Refining Co. v. Louisiana, 179 U. S. 89, and other cases announcing that rule.

The Bengsch case falls within the second proposition before stated, and correctly holds that the burdens imposed by the act there involved, were a tax upon the property mentioned therein, and that the same were void because the act was not uniform in its operation, as was pointed out in the opinion. The other cases cited by counsel for respondent were decided upon the same ground as that stated in the Bengsch case, and correctly held that the taxes levied were illegal for the same reason. But upon the other hand, the case of State v. Stucker, supra, falls within the third proposition before stated, and holds that the burdens imposed by the act there involved were not taxes imposed upon the property mentioned therein, but were license fees required to be paid by the licensee

for and in consideration of the license or privilege granted to him to conduct the business mentioned in the act, and for that reason did not violate the equality clause of the State or Federal Constitution.

The Louisiana and other cases cited by counsel for the State and considered by us, are based upon the same rule announced in the Stucker case. The Louisiana case, however, did not involve a liquor license, and for that reason it is more favorable to the State than most cases of that character.

By this analysis of the two classes of cases it is seen that the burdens imposed by the acts involved in the one are taxes imposed upon property and fall within the constitutional provision mentioned, and that those imposed by the others are license fees, or the price paid by the licensees to the State in consideration for the right or privilege to conduct the business mentioned, which are not subsequent to the constitutional provision mentioned.

The latter cases involved the constitutionality of a statute similar to the act here under consideration, and the opinions delivered therein are directly in point in the case at bar, and for the reasons stated in those cases, we hold this act does not violate either section 3 or 4 of article 10 of the Constitution of Missouri, or section 1 of the 14th Amendment of the Constitution of the United States.

But suppose, for the sake of the argument, that the tax mentioned in section 5 of this act is a tax imposed upon the liquors therein mentioned, as was done by the Texas act which was involved in the case of Tiernan v. Rinker, supra, and for that reason, and the additional one that it exempts wines and spirituous liquors made from grapes and fruits grown in this State, is violative of the equality clauses of the State and Federal Constitutions. Still, under the facts of this case, as disclosed by the record, it is unavailing to the respondent for the reason that under the supposition

stated, this act is inoperative, in so far as it discriminates against wines and spirits made from grapes and fruits grown in other States and imported into this, when sold separately from other liquors.

(But in this connection the fact should not be lost sight of, that section 1 of the 14th Amendment of the Constitution of the United States, standing alone, has no application to such discriminations as the one last mentioned. Such discriminations are governed mainly by section 8 of article 1 of the Federal Constitution, which prohibits the States from enforcing any law which materially interferes with interstate commerce. Cox v. Texas, 202 U. S. l. c. 451, and cases cited.)

A tax cannot be exacted from the sale of wines and spirits when of foreign manufacture, if not exacted from their sale when of domestic manufacture. If a party be engaged *exclusively* in the sale of these liquors, or in any business for which a tax is levied because it embraces a sale of them, he may justly object to the discriminating character of the act, and on that account challenge its validity under all of the decisions touching this question; but if he is engaged in the manufacture or sale of other liquors than wines and spirituous liquors made of grapes and fruits, he cannot complain of the State tax, on the ground of discrimination. The act does not discriminate in favor of any other home manufacture. It makes it unlawful to manufacture or sell in this State, any kind of intoxicating liquors, except wines and spirits made from grapes and fruits grown in this State, without first taking out a license under the requirements of the act. This being the true meaning of the act, there can be no objection to its enforcement where the tax is levied upon occupations for the manufacture and sale of other liquors than wines and spirits made from grapes and fruits. In this case the information does not charge respondent with the manufacture and sale of wines or spirits made from grapes or fruits

grown in this State; but upon the other hand it charges respondent with manufacturing, rectifying and selling other intoxicating liquors not being wines or spirits grown in this State. Upon this state of the record there is no reason why the respondent should be exempted from the tax when selling whiskies, beer and other alcoholic drinks, because it could 'not be taxed if its occupation was limited to wine and spirits made of grapes and fruits. [Tiernan v. Rinker, 102 U. S. 1. c. 127.] The same ruling was had in the case of Cox v. Texas, supra, page 450. [McGuire v. State, 42 Ohio St. 1. c. 536.]

We therefore hold that this act does not violate either section 3 or 4 of article 10 of the Constitution of Missouri, or section 1 of the 14th Amendment of the Constitution of the United States.

III. Counsel next insist that the Act of 1909 is violative of sections 6 and 7 of article 10 of the Constitution, in that it exempts from taxation property which is prohibited by those sections of the organic law of the State.

Those sections read as follows:

"Section 6. The property, real and personal, of the State, counties and other municipal corporations, and cemeteries shall be exempt from taxation. Lots in incorporated cities or towns, or within one mile of the limits of any such city or town, to the extent of one acre, and lots one mile or more distant from such cities or towns, to the extent of five acres, with the buildings thereon, may be exempted from taxation, when the same are used exclusively for religious worship, for schools, or for purposes purely charitable; also such property, real and personal, as may be used exclusively for agricultural or horticultural societies: *Provided.* such exemptions shall be only by general law."

"Section 7. All laws exempting property from taxation, other than the property above enumerated, shall be void."

The act in question exempts from its operation the tax therein mentioned from the sales of all "wines or spirits made from grapes or fruits grown in this State," etc. .

If the tax mentioned in the act is a tax within the meaning of those two sections of the Constitution, then clearly the exemption therein provided for is void for the reason that the property referred to is not devoted to any of the purposes mentioned in said section 6 of the Constitution, and must therefore violate the provisions of both.

This insistence again presents the question: Is the burden imposed by section 5 of this act a tax within the meaning of the Constitution, or is it a license fee, and in consideration of the right and privilege granted by the former to the latter to engage in the business there mentioned in this State?

We carefully and exhaustively considered that question in paragraphs one and two of this opinion, and after reviewing numerous authorities bearing upon both of those propositions, reached the conclusion, and held, that said burden was not a tax, but a license fee, as therein defined. [State ex rel. v. Henderson, 160 Mo. l. c. 217.]

We adhere to that ruling, and must therefore decide this insistence against respondents.

IV. The fourth attack made upon the constitutionality of this act is, that it deprives respondent of its property without due process of law, in contravention of section 30 of article 2 of the Constitution of Missouri, and section 1 of the 14th Amendment of the Constitution of the United States.

This contention of counsel for respondent is best stated in their own language, which is as follows:

"The Act of June 1, 1909, is designed to apply to wholesalers, retailers, manufacturers and rectifiers of malt, fermented and spirituous liquors. If such is its application, in fact, there might be no exception taken to it, as violative of the 'due process' clauses of the State and Federal Constitutions. But under the specific terms of the act the manufacturers and dealers in intoxicating liquors are divided and classified, and certain classes are exempted entirely from payment of the tax imposed, while some are made subject to the payment of a less amount than others. For example, under the terms of section 5 two general classes of licenses are provided for, to-wit, merchants' licenses and manufacturers' licenses. A merchant who sells intoxicating liquors is compelled to take out a merchant's license. A manufacturer of intoxicating liquors at any place besides the place of manufacture is compelled to take out a merchant's license and a manufacturer's license, while the same class of dealer selling at wholesale only, at the place of manufacture, is only compelled to take out a manufacturer's license. Concretely stated, the merchant can be compelled to pay a maximum sum of $1000; the manufacturing merchant selling at place of manufacture can be compelled to pay $1000; while the manufacturing merchant selling at a place other than the place of manufacture can be compelled to pay twice the sum of either of the foregoing, or $2000.

"Nor is this the least discriminatory provision. Druggists, licensed dramshop-keepers, pharmacists, or social, commercial or other clubs are entirely exempted from payment of the tax imposed, although they may all be wholesalers or retailers of intoxicating liquors, and therefore belonging to the general class to which, by its title, the act applies.

"In addition to all of which the final exemption is noted—those dealing in, manufacturing or selling wines or spirits made from grapes or fruit grown in

the State of Missouri. This is a more arbitrary and unlawful exemption (if there can be degrees of unlawfulness) than those noted above, because clearly it springs from a selfish desire to protect the products of this State at the expense of products of sister States.''

In support of those contentions, counsel refer us to the following cases: State v. Julow, 129 Mo. 172; State ex rel. v. Ashbrook, 154 Mo. 375; State v. Loomis, 115 Mo. 315; Cooley on Const. Limit. (6 Ed.) 484; Giozza v. Tiernan, 148 U. S. 659; Barbier v. Connolly, 113 U. S. 31; Railroad v. Pennsylvania, 134 U. S. 232; State v. Bengsch, 170 Mo. l. c. 117.

Upon an investigation of those authorities we found that they proceeded upon the admission or assumption that the taxes imposed by the acts thereunder consideration, were ordinary taxes imposed upon property, and for that reason the rules announced by them have no application to acts providing for the collection of license fees, required to be paid for the privilege of selling intoxicating liquors, as will appear from the following authorities.

In treating this question, Mr. Black in his work on Intoxicating Liquors, section 107, page 143, says: ''A statute taxing the business of liquor selling may provide for the collection of the tax . . . and may impose penalties for its non-payment. . . . Such provisions cannot be said to deprive the citizen of his rights or property without due process of law.'' [Black on Intoxicating Liquors, secs. 37, 83, 108, 109.] To the same effect is Adler v. Whitbeck, 44 Ohio, 539.

''Legislation is not open to the charge of depriving one of his rights without due process of law if it be general in its operation upon the subjects to which it relates.'' [Dent v. West Virginia, 129 U. S. 124; State v. Cantwell, 179 Mo. l. c. 264.]

In the case of State v. Cantwell, 179 Mo. l. c. 264. the court said: ''Legislation is not open to the charge

of depriving one of his rights without due process of law, if it be general in its operation upon the subjects to which it relates." [Dent v. West Virginia, 129 U. S. 124.] The same court has held that statutes creating a different rule of liability, as applied to one class of persons, from that generally in force, do not infringe the right to 'due process of law.' [Railroad v. Humes, 115 U. S. 512; Railroad v. Mackey, 127 U. S. 205.] And the Supreme Court of this State has determined that 'a statute which relates to persons or things as a class is a general law, while a statute which relates to particular persons or things of a class is special.' [State ex rel. Lionberger v. Tolle, 71 Mo. 650.]"

And in the consideration of the same question the Supreme Court of the United States, in the case of Dent v. West Virginia, 129 U. S. 1. c. 123, speaking through Mr. Justice FIELD, said: "As we have said on more than one occasion, it may be difficult, if not impossible, to give to the terms 'due process of law' a definition which will embrace every permissible exertion of power affecting private rights and exclude such as are forbidden. They come to us from the law of England, from which country our jurisprudence is to a great extent derived, and their requirement was there designed to secure the subject against the arbitrary action of the crown and place him under the protection of the law. They were deemed to be equivalent to 'the law of the land.' In this country, the requirement is intended to have a similar effect against legislative power, that is, to secure the citizen against any arbitrary deprivation of his rights, whether relating to his life, his liberty, or his property. Legislation must necessarily vary with the different objects upon which it is designed to operate. It is sufficient, for the purposes of this case, to say that legislation is not open to the charge of depriving one of his rights without due process of law, if it be general in its opera-

tion upon the subjects to which it relates, and is enforceable in the usual modes established in the administration of government with respect to kindred matters: that is, by process or proceedings adapted to the nature of the case. The great purpose of the requirement is to exclude everything that is arbitrary and capricious in legislation affecting the rights of the citizen. As said by this court in Yick Wo v. Hopkins, speaking by Mr. Justice MATTHEWS: 'When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power.' [118 U. S. 356, 369.] See, also, Pennoyer v. Neff, 95 U. S. 714, 733; Davidson v. New Orleans, 96 U. S. 97, 104, 107; Hurtado v. California, 110 U. S. 516; Missouri Pacific Railway Co. v. Humes, 115 U. S. 512, 519.''

There is no longer any question but what the State may absolutely abolish the traffic in intoxicating liquors entirely, and if it can do that and not thereby take one's property without due process of law, then how can it be logically contended that his property is taken without due process when a legislative act only undertakes to regulate its traffic?

HARLAN, J., in the case of Mugler v. Kansas, 123 U. S. 1. c. 659, quoted with approval the following from Beer Co. v. Massachusetts, 97 U. S. 1. c. 33: ''As a measure of police regulation, looking to the preservation of public morals, a State law prohibiting the manufacture and sale of intoxicating liquors is not repugnant to any clause of the Constitution of the United States.''

In section 37, page 48, Mr. Black in his excellent work on Intoxicating Liquors, upon that subject says: ''And although it may deprive persons of the right to pursue a business previously lawful, and may have

the effect of diminishing the value of property owned by them and specially adapted to the continuance of the business, it does not, for that reason, amount to a deprivation of their property or liberty without due process of law, within the meaning of the Constitution. Neither does it violate the privileges or immunities secured to citizens of the United States by the Fourteenth Amendment." The text is sustained by the following cases: Crowley v. Christensen, 137 U. S. l. c. 91; Cox v. Texas, 202 U. S. 446; Downham v. Alexandria, 77 U. S. 173; Kidd v. Pearson, 128 U. S. 1; Williams v. Fears, 179 U. S. 270; Moore v. Indianapolis, 120 Ind. 483; Drake v. Kaiser, 73 Iowa, 703.

V. The sixth objection made by counsel for respondent to the constitutionality of this act, is untenable. This contention is that the act violates the Fifth Amendment of the Constitution of the United States, which provides that no one shall be deprived of his property without due process of law.

This contention presents practically the same proposition that was considered in the preceding paragraph of the opinion; and for the reasons there stated this contention is unsound. It is also unsound for the reason that the Fifth Amendment of the Constitution of the United States has no reference to the laws of a State, but relates solely to the enactments of Congress. The Supreme Court of the United States has so held in numerous cases: Livingston v. Moore, 32 U. S. 469; Eilenbecker v. District Court, 134 U. S. 34; Thorington v. Montgomery, 147 U. S. 490; Brown v. New Jersey, 175 U. S. l. c. 174.

VI. It is finally insisted by counsel for respondent that the Act of 1909 is unconstitutional and void for the following reasons stated by them:

"The act (Sec. 1) entirely exempts from its operation 'makers and sellers of wines or spirits produced

from grapes or fruits grown in this State,' while it imposes a heavy tax on makers and sellers of wines and spirits produced from grapes or fruits grown in other States, as well as upon such wines and spirits themselves, and thereby denies to the citizens of other States the equal protection of the laws of the State of Missouri; attempts to regulate commerce between such other States and the State of Missouri, and attempts to levy an impost or import duty or tax on the products of other States coming into the State of Missouri; all contrary to section 1, article 14, Constitution of the United States; section 2, article 4, Constitution of the United States; section 9, article 1, Constitution of the United States; section 10, article 1, Constitution of the United States.''

We will consider the several propositions presented by this final contention in the order stated.

(a). The first contention presented under this general insistence, that the act in question is void because it violates section 1 of the 14th Amendment and section 2 of article 4 of the Federal Constitution, which forbids any State to enforce any law which shall ''abridge the privileges or immunities of citizens of the United States,'' is untenable for the reason that the right to sell intoxicating liquors is not one of the privileges or immunities guaranteed by those sections of the Constitution.

That question was presented to the Supreme Court of the United States for determination, in the case of Giozza v. Tiernan, 148 U. S. l. c. 661, and Chief Justice FULLER, in speaking for the court, said: ''There is nothing in the Constitution of Texas restricting the power of the Legislature in reference to the sale of liquor, and it is well settled that the Legislature of that State has the power to regulate the mode and manner and the circumstances under which the liquor traffic may be conducted, and to surround the right to pursue it with such conditions, restric-

tions and limitations as the Legislature may deem proper. [Ex parte Bell, 24 Tex. App. 428; Bell v. State, 28 Tex. App. 96.] In these cases, and in the case before us, the law in question was held to be within the legislative power; and, so far as the State Constitution is concerned, that conclusion is not reexaminable here. But it is contended that the act conflicts with the provisions of the Fourteenth Amendment, that 'no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.' The privilege and immunities of citizens of the United States are privileges and immunities arising out of the nature and essential character of the national government, and granted or secured by the Constitution of the United States, and the right to sell intoxicating liquors is not one of the rights growing out of such citizenship.''

The act under consideration being a police regulation as we have previously shown, the 14th Amendment, standing alone, has no application thereto, as is shown by the following decisions of the United States Supreme Court, viz.:

''The amendment [Fourteenth] does not take from the States those powers of police that were reserved at the time the original Constitution was adopted. . . . It was not designed to interfere with the power of the State to protect the lives, liberty and property of its citizens, and to promote their health, morals, education and good order.''

In the case of Barbier v. Connolly, 113 U. S. l. c. 3, Justice FIELD said: ''But neither the amendment [Fourteenth], broad and comprehensive as it is, nor any other amendment, was designed to interfere with the powers of the State, sometimes termed its police

power, to prescribe regulations to promote the health, peace, morals, education and good order of the people, etc.''

In the case of Powell v. Pennsylvania, 127 U. S. l. c. 683, in discussing the oleomargarine act of Pennsylvania, Mr. Justice HARLAN said: ''It is scarcely necessary to say that if this statute is a legitimate exercise of the police power of the State for the protection of the health of the people, . . . it is not inconsistent with the amendment [Fourteenth]; for it is the settled doctrine of this court that, as government is organized for the purpose, among others, of preserving the public health and the public morals, it cannot divest itself of the power to provide for those objects; and that the Fourteenth Amendment was not designed to interfere with the exercise of that power by the States.''

In the case of In re Kemmler, 136 U. S. l. c. 449 (34 Law Ed. 524), Chief Justice FULLER said: ''But it [Fourteenth Amendment] was not designed to interfere with the power of the State to protect the lives, liberties and property of its citizens, and to promote their health, peace, morals, education and good order.''

In the case of Mugler v. Kansas, 123 U. S. 623 (31 Law Ed. l. c. 209) we take the following extract from that opinion: ''Referring to the contention that the right to sell intoxicating liquors was secured by the Fourteenth Amendment, the court said (in Bartemeyer v. Iowa, 18 Wall. 129), that 'so far as such a right exists, it is not one of the rights growing out of the citizenship of the United States.' In Beer Co. v. Massachusetts, 97 U. S. 33, it was said, that, 'As a measure of police regulation, looking to the preservation of public morals, a State law prohibiting the manufacture and sale of intoxicating liquors is not repugnant to any clause of the Constitution of the United States.' Finally, in Foster v. Kansas, 112 U. S. 206,

the court said that the question as to the constitutional power of a State to prohibit the manufacture and sale of intoxicating liquors was no longer an open one in this court. These cases rest upon the acknowledged right of the States of the Union to control their purely internal affairs, and, in so doing, to protect the health, morals, and safety of their people by regulations that do not interfere with the execution of the powers of the general government, or violate rights secured by the Constitution of the United States.''

The respondent also quotes from the opinion in the case of Giozza v. Tiernan, 148 U. S. 659. It quotes, however, that part of the opinion which has reference only to the taxation of property and does not refer to that part of the opinion quoted by us, upholding the statute of the State of Texas regulating the sale of whiskey under the police power. That opinion when read in its entirety is a very strong one in favor of the State.

In passing upon this question on the Beer Inspection Law affecting the manufacture and sale of beer, Judge GANTT, in the case of State v. Bixman, 162 Mo. at 39, said: "As to the charge that this act violates the Fourteenth Amendment of the Federal Constitution, it need only be said that the Fourteenth Amendment was never designed to prevent a State from adjusting its system of taxation, or to interfere with the exercise of its exclusive right to make all proper police regulations to promote the health, peace, morals, education or good order of its people, so long as some particular provision of the Constitution of the United States is not infringed. [Barbier v. Connolly, 113 U. S. 27; Bell's Gap R. Co. v. Pennsylvania, 134 U. S. 238.]''

Black on Intoxicating Liquors in section 36 says: "The Fourteenth Amendment forbids the States to make or enforce any law which shall 'abridge the priv-

236 Sup.—20

ileges or immunities of citizens of the United States.'
But the right to sell intoxicating liquors is not one of
the privileges or immunities here contemplated.''

In section 37, the same author says: ''And al-
though it may deprive persons of the right to pursue
a business previously lawful, and may have the effect
of diminishing the value of property owned by them
and especially adapted to the continuance of the busi-
ness, it does not for that reason amount to a depri-
vation of their property or liberty without due pro-
cess of law, within the meaning of the Constitution.
Neither does it violate the privileges or immunities
secured to citizens of the United States by the Four-
teenth Amendment. Nor, if confined to persons and
property fully within the jurisdiction of the State, is
it invalid as a regulation of foreign or interstate com-
merce.''

The same author, in section 48, says: ''Neither
is a restriction of this character repugnant to the ex-
clusive power of Congress to regulate interstate com-
merce. If it should have any effect upon such com-
merce, its relation to it would be only remote and in-
cidental. Nor does it contravene the provision of the
Fourteenth Amendment.''

In section 82, the same author says: ''The liquor
traffic is nowhere in this country recognized as a law-
ful business, except as permitted and regulated by
positive law. It is not a vocation which every man
has a natural right to pursue. It does not stand on
the same level with such occupations as are useful to
the community or beneficial to the trade and com-
merce of the country. On the contrary it is pernicious
in its effects, and is properly subject to regulation
under the police power. It is in no sense, therefore,
a privilege or immunity such as is secured by the
Constitution.''

As regards said section 2 of article 4, it is suffi-
cient to state that, even if it is applicable to State

laws, the adjudications before mentioned are equally applicable to it, and refute the contention of counsel for respondent in that regard also.

We therefore rule this insistence against respondent.

(b). We are also of the opinion that this act does not violate section 10 of article 1 of the Constitution of the United States, which prohibits any State from levying an impost or import duty or tax on property from other States coming into this State.

That question was presented to this court in the case of State v. Bixman, 162 Mo. 1. In discussing that question, Judge GANTT, on page 39, said: ''As to the charge that it violates section 10 of article 1 of the Constitution of the United States, which declares that 'no State shall without the consent of Congress lay any imposts or duties upon imports or exports except what may be absolutely necessary for executing its inspection laws; and the net produce of all duties and imports laid by any State on imposts or exports shall be for the use of the treasury of the United States, and all such laws shall be subject to revision and control of the Congress,' it is the settled judicial construction of this section that it refers only to imports from foreign countries, and not from one State into another; but, even if our inspection law is held to be excessive as to imports, it is not subject to judicial review, but must stand till Congress shall see fit to alter it.''

That such legislation does not violate this constitutional provision is sustained by the following authorities, among many others: Brown v. Maryland, 25 U. S. 419; Woodruff v. Parham, 75 U. S. 123; Waring v. Mayor, 75 U. S. 110.

(c). It is finally insisted that the Act of 1909 is void because it violates section 8 of article 1 of the Constitution of the United States, which reserves to

Congress the exclusive right to regulate interstate commerce.

In support of this contention we are cited to the following cases: State v. North, 27 Mo. 464; Walling v. Michigan, 116 U. S. 446; Pierce v. State, 13 N. H. 582; Brown v. Maryland, 25 U. S. 439; Darnell v. Memphis, 208 U. S. 115; Welton v. Missouri, 91 U. S. 275; Guy v. Baltimore, 100 U. S. 434.

In the case of State v. North, supra, the court had under consideration a statute of this State, containing the following provision: "Merchants 'shall pay an *ad valorem* tax . . . upon all goods . . . . purchased by them, except such as may be the growth, produce or manufacture of this state, and except such manufactured articles as may be the growth or produce of other states.' " In discussing this provision the court, on page 471, said: "It clearly appears from the statute that it exempts from tax or license the merchant who deals in goods the growth or produce of this State, while those who deal in the like goods of other States are compelled to take out a license, which can only be obtained by paying an *ad valorem* tax on all the goods received for sale. . . . The power to regulate commerce . . . among the several States having been conferred by the Constitution on Congress, and the power to lay and collect duties and imposts being vested in the same body, . . . it is conceived that the history of the time . . . will show that the law, whose validity is the subject of consideration, is in conflict with the spirit and meaning of the Federal Constitution. . . . But, whatever may be the motive for the tax . . . it is equally a regulation of commerce, and in effect an exercise of the power of laying duties on imports; and its exercise by the States is entirely at war with the spirit of the Constitution. . . . Can any power more destructive to the union and harmony of the States be exercised than that of

imposing discriminating taxes or duties on imports from other States? . . . Under a power to levy a discriminating tax between domestic and foreign products commerce may not only be regulated but indirectly a duty may be laid on imports. In laying a tax discriminating against the imports from foreign nations of the sister States, a duty is as effectually laid as though the tax had been demanded before the importation was allowed. What is the difference between collecting the tax before the import is admitted and singling it out from all others after it has been admitted and subjecting it to the same tax? . . . There is no difference in principle between laying a duty before an article is imported and the imposing a discriminating tax, which, after its importation and incorporation into the mass of the property of the State, prevents its sale. That which can not be done directly can not be done indirectly."

To like effect Pierce v. State, 13 N. H. 582.

The Brown v. Maryland case had under consideration a statute of Maryland which required all importers of foreign goods by the bale, or package, and all persons selling them by wholesale, bale or package, to take out a license, for which they should pay $50. That statute was held invalid because it violated section 10 of article 1 of the Constitution of the United States, which prohibits any State from levying imposts or import duties upon goods imported into this country from foreign countries.

In the case of Darnell v. Memphis, supra, the court had under consideration a statute of Tennessee, which provided for the imposition of certain taxes. The statute contained a provision exempting from the payment of the tax "all growing crops . . . the direct produce of the soil of this State in the hands of the producer and immediate vendor, and manufactured articles from the produce of the State in the hands of the manufacturer." The lower court of

chancery of Tennessee held that this act contravened the commerce clause and the 14th Amendment. On the appeal the Supreme Court of the State reversed the lower court and held: ''That the origin of property may be in another State, nevertheless when it is brought into this State and here merged into the mass of general property, it at once becomes subject to the tax laws of this State.'' The Supreme Court of the United States, commenting on that portion of the State Court's opinion cited above, said: ''While it is undoubted . . . that where property . . . is at rest within a State and has become commingled with the mass of property therein, it may be taxed without imposing a burden on interstate commerce, that doctrine . . . has always expressly excluded the conception that a State could, without directly burdening interstate commerce, discriminate against such property by imposing upon it a burden of taxation greater than that levied upon domestic property of like nature.'' And the court, in reversing the judgment of the State Supreme Court, said (p. 125): ''As there can be no doubt . . . that the disputed tax . . . was a direct burden upon interstate commerce, since the law of Tennessee in terms discriminated against property the product of the soil of other States brought into the State of Tennessee, . . . it follows that the court below erred in deciding the tax to be valid.''

In the case of Welton v. Missouri, the statute provided that whoever shall deal in the selling of patent or other medicines, goods, wares and merchandise, except books, charts, maps and stationery, which are not the growth, produce or manufacture of this State, by going from place to place to sell the same, is declared to be a peddler, ''and no one shall be allowed to deal without a peddler's license.'' The 7th section of the act provided for the imposition of a license tax. This act had been held constitutional by the State Supreme Court (55 Mo. 288). Whereupon writ of error

was sued out of the United States Supreme Court. In holding the law unconstitutional the court said, p. 281: "If Missouri can require a license tax for the sale by traveling dealers of goods which are the growth, product or manufacture of other States or countries, it may require such license tax as a condition of their sale from ordinary merchants, and the amount of the tax will be a matter resting exclusively in its discretion. . . . Imposts operating as an absolute exclusion of the goods would be possible, and all the evils of discriminating state legislation, favorable to the interests of one State and injurious to the interests of other States and countries, which existed previous to the adoption of the Constitution, might follow, and the experience of the last fifteen years shows would follow, from the action of some of the States. . . . It is sufficient to hold now that the commercial power continues until the commodity has ceased to be the subject of discriminating legislation by reason of its foreign character. That power protects it, even after it has entered the State, from any burdens imposed by reason of its foreign origin. The act of Missouri encroaches upon this power in this respect, and is therefore, in our judgment unconstitutional and void."

In the case of Guy v. Baltimore, 100 U. S. 434, the invalidity was adjudged of an ordinance of the City of Baltimore, which established rates of wharfage to be charged on vessels resorting to, or lying at, "landing, depositing, or transporting goods or articles other than the productions of this State, on any wharf or wharves belonging to said mayor and city council," etc. The principle settled by the earlier cases (which are referred to) was reaffirmed, the court saying: "In view of these and other decisions of this court, it must be regarded as settled that no State can, consistently with the Federal Constitution, impose upon the products of other States, brought therein

for sale or use, or upon citizens because engaged in the sale therein, or the transportation thereto, of the products of other States, more onerous public burdens or taxes than it imposes upon the like products of its own territory. . . . In the exercise of its police powers, a State may exclude from its territory, or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to the health or which would endanger the lives or property of its people. But if the State, under the guise of exerting its police powers, should make such exclusion or prohibition applicable solely to articles, of that kind, that may be produced or manufactured in other States, the court would find no difficulty in holding such legislation to be in conflict with the Constitution of the United States."

In Walling v. Michigan, 116 U. S. 446, an act of the State of Michigan which imposed a tax or duty on persons who, not having their principal place of business within the State, engaged in the business of selling, or soliciting the sale of, certain described liquors to be shipped into the State, was held to be repugnant to the commerce clause of the Federal Constitution. The court said: "A discriminating tax imposed by a State operating to the disadvantage of the products of other States when introduced into the first mentioned State, is, in effect, a regulation in restraint of commerce among the States, and as such is a usurpation of the power conferred by the Constitution upon the Congress of the United States."

From this brief review of the cases cited by counsel for respondent, it will be seen that the statute considered in each imposed a tax upon the property imported to this country, from a foreign country, or from one State into another. It also appears from each of these cases, that the party from whom the tax was sought to be collected, was engaged in a legitimate business, whch he had the fundamental right to pur-

sue, and which was guaranteed to him by the Constitution of the United States, and not simply a privilege, which could be exercised only by virtue of a license issued by the State. [Corfield v. Coryell, 4 Washington (U. S.) 380; Slaughter-House Cases, 83 U. S. l. c. 116.]

That being true, counsel for the State insist that those facts differentiate those cases from the case at bar, where the respondent has no fundamental or natural right to engage in the liquor business, mentioned in the act, without first procuring a license from the State authorizing it to so do.

Counsel further insist that the Act of 1909 was enacted under the police power of the State, regulating the manufacture and sale of intoxicating liquors, a subject solely and purely within its authority and jurisdiction; that the provisions thereof limit its operation to persons, property and business pursuits wholly within the State, and consequently it does not violate the constitutional provision, known as the "Commerce Clause."

Counsel for the State also insist, that: "Even if this were not so, the Wilson Law, approved August 8, 1890, removes this challenge for good and for all." That act, so far as is material, is as follows: "That all fermented, distilled, or other intoxicating liquors or liquids transported into any State or Territory or remaining therein . . . shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise." This provision is contained in the Acts of the Fifty-first Congress of the United States, first session, ch. 728, p. 313.

We will consider the last insistence first.

Judge GANTT, in passing upon the case of State v. Bengsch, 170 Mo. 1. c. 115, used some language which was purely *obiter* that lends countenance to this insistence of counsel for the State. But when we look deeper into the Wilson Act, and view it in the light of its history, and under the decisions of the Supreme Court of the United States, it will be seen that it does not serve the purpose here assigned to it, by counsel for the State.

After the adoption of the prohibition and local option law by many of the States of the Union, unscrupulous persons sought to take an impoper advantage of the interstate commerce clause of the Constitution of the United States, and under the authority thereof would ship into such States, for the use of the consumer, intoxicating liquors in what was known as the "Original Package," and thereby violate the spirit if not the letter of said prohibition and local option laws. Under that status of the law, neither the courts of justice nor other State officials had sufficient authority to effectively remedy the many abuses before suggested. The courts when confronted with that condition of things frequently suggested that relief from that situation might be granted by an act of Congress. Interested parties grasping the suggestion, urged upon Congress the importance and necessity of such an act. In consequence thereof, the Wilson Act was duly enacted. From this brief history of that act, it must be apparent that Congress never designed thereby to authorize the legislature of a State to enact laws materially interfering with interstate commerce, but only intended to remove the shield under which the State laws were being violated by those designing persons with impunity; or in other words, the clear intention of Congress was to subject intoxicating liquor shipped from one State into another to the laws of the State to which

it was shipped, and thereby subject both foreign and domestic liquors to the same law, but nothing more.

The Supreme Court of the United States, in the case of Scott v. Donald, 165 U. S. 98, has expressed the same views. That case involved the constitutionality of the law known as the "South Carolina Dispensary Law." In discussing the application of the Wilson Act to that law, the court, on page 100, said: "The question whether a given state law is a lawful exercise of the police power is still open, and must remain open, to this court. Such a law may forbid entirely the manufacture and sale of intoxicating liquors and be valid. Or it may provide equal regulations for the inspection and sale of all domestic and imported liquors and be valid. But the State cannot, under the Congressional legislation referred to, establish a system which, in effect, discriminates between interstate and domestic commerce in commodities to make and use which are admitted to be lawful."

We therefore hold that the Wilson Act is not controlling in this case.

This brings us to the consideration of the question: Does the Act of 1909 attempt to regulate or interfere with interstate commerce?

The act requires all persons who manufacture, rectify or sell intoxicating liquors in this State, except wines or spirits made from grapes or fruits grown herein, to take out a license and pay the fees mentioned in section 5 thereof. The information filed against respondent charges it with engaging in the business of manufacturing, rectifying and selling in this State, intoxicating liquors, not being wine or spirits made from grapes or fruits grown in this State. This information, in effect, charges respondent with the violation of this act, in that it is engaged in selling or exposing for sale, intoxicating liquors manufactured in other States or countries, and shipped into this, not made of grapes or fruits grown in this State; and in that it is

manufacturing and selling, in this State, intoxicating liquors not made of grapes or fruits grown in this State, without having taken out a license therefor, and without having paid the fees required to be paid by section 5 of the act. That must of necessity be the effect of the charge; for the reason that the information, by the exception therein, in effect, states that respondent was not charged with manufacturing, rectifying, selling or exposing for sale, wine or spirits made of grapes or fruits grown in this State. That being true, that there was no other intoxicating liquors respondent could manufacture or sell, except those before mentioned.

In other words, this act attempts to license persons to sell intoxicating liquors in this State manufactured in other States; and to manufacture and sell intoxicating liquors in this State not made of grapes and fruits grown herein; and to impose upon the licensee the payment of the license fees prescribed by the fifth section, for the privilege so attempted to be granted, but no such license is required to authorize the manufacture or sale of wines or spirits made of grapes or fruits grown in this State, nor are the fees mentioned in the fifth section required to be paid by the licensee for the privilege of manufacturing or selling wines and spirits made from grapes or fruits grown in this State.

By this analysis of the act, and the information drawn thereunder, it is perfectly apparent that the act, whether designedly or not, discriminates in favor of wines and spirits made from grapes or fruits grown in this State, and against the same kind of wines and spirits made from grapes or fruit grown elsewhere, and thereby imposes burdens in the form of license fees upon interstate commerce.

That cannot and should not be tolerated, even under the guise of a police regulation. That authority has been wisely delegated by the several States, to Con-,

gress, by the Constitution of the United States; and no State should be permitted to enforce any law, whatever its character may be, which stifles or materially interferes with interstate commerce.

I know of no power the several States could exercise which would be fraught with greater evil. It would generate intense friction between the States; create bad feeling between their citizens; prevent the free exchange of their surplus products; and stifle interstate commerce in general. This would lead to retaliation, sectional strife, bloodshed and war.

In my opinion the commercial clause of the Constitution is one of the wisest provisions contained in that wonderful document, and shows the wisdom and clear foresight of our forefathers. Under its beneficent provisions, the States must remain at peace with each other; the surplus products of each may be freely exchanged; drought or famine, in any one, could not bring want or starvation to her people; the necessities and comforts of life are distributed to all; business is transacted upon broad and national lines; and intercourse between their citizens is untrammeled; each is a brother and not an alien.

Returning to the question in hand.

In the case of Darnell v. Memphis, 208 U. S. 115, the statute of Tennessee, after authorizing the taxation of all real and personal property of the State, exempted from its operation "all growing crops of whatever nature and kind, the direct product of the soil of this State in the hands of the producer and his immediate vendee, and manufactured articles from produce of the State, in the hands of the manufacturer." Darnell & Son Company was a corporation existing under the laws of Tennessee, and domiciled in Memphis, and there owned and operated a lumber mill. Shortly prior to January 30, 1905, pursuant to the statute mentioned, the personalty of the Darnell Company was assessed for taxation at $44,000. Of that amount

$19,325 was the value of logs cut from the soil of States other than Tennessee, which the company had shipped into Tennessee, and were held by the company as the immediate purchaser, awaiting manufacture into lumber, or consisted of lumber already manufactured by the company from logs which had been acquired and brought into Tennessee from other States, all of which was lying in the mill yard awaiting sale. The Darnell Company protested against the assessment, claiming that it was not liable to be taxed for the $19,325, the value of the property owned by it as the immediate purchaser of logs bought from other States, or the lumber, the product thereof. The basis of this contention was that the property represented by the valuation in question could not be taxed without discriminating against it or like property, and being the product of the soil of Tennessee, was exempt from taxation under the constitution and laws of the State, and therefore to tax said property would violate the commerce clause of section 8 of article 1 of the Constitution, and the equal protection clause of the Fourteenth Amendment thereof.

From this statement of the proposition, it will be seen that it is of a twofold character, one relating to the commerce clause and the other to the equal protection clause of the Fourteenth Amendment; and for that reason, both of those sections must be considered in the determination of this question, and all similar questions. [Cox v. Texas, 202 U. S. l. c. 451; Darnell v. Memphis, supra, 118; Dewey v. Des Moines, 173 U. S. 193, 198.]

Upon the facts before stated, the Supreme Court of Tennessee decided against the company and held the statute imposing the tax valid. Thereupon the company sued out a writ of error from the Supreme Court of the United States. The latter court in reversing the judgment of the Supreme Court of Tennessee, on page 119, said:

"As we are of opinion that the question for decision is clearly foreclosed by prior decisions of this court, which demonstrate that the court below misconceived the rulings of this court upon which it relied, we do not stop to analyze the reasoning of the court considered as an original proposition, but come at once to test its correctness by making a brief review of the decided cases relied upon by the court below and others not referred to which relate to the subject, and which are controlling.

"As a prelude to a review of the cases referred to, we observe that while it is undoubted that it has been settled that where property which has moved in the channels of interstate commerce is at rest within a State and has become commingled with the mass of property therein, it may be taxed by such State without thereby imposing a direct burden upon interstate commerce, that doctrine, as expounded in the decided cases, including those relied upon by the court below, has always expressly excluded the conception that a State could, without directly burdening interstate commerce, discriminate against such property by imposing upon it a burden of taxation greater than that levied upon domestic property of a like nature.

"The leading cases announcing the doctrine that a State may tax property which had moved in the channels of interstate commerce, when such property had become at rest therein, even before sale in the original package, are Woodruff v. Parham, 8 Wall. 123, and Brown v. Houston, 114 U. S. 622. But in both those cases it was sedulously pointed out that the power which was thus recognized did not, and could not, include the authority to burden the property brought from another State with a discriminating tax. In American Steel Wire Co. v. Speed, 192 U. S. 500, 519, where the doctrine of Woodruff v. Parham and Brown v. Houston was reviewed and restated, it was pointed out that to prevent the levy of a tax upon

property brought from another State, even after it had come at rest within a State, from being a direct burden upon interstate commerce, property so situated must be taxed 'without discrimination, like other property situated within the State.'

"The statements just made adequately point out the misconception as to the rulings of this court upon which the court below placed its conclusion, since the court took no heed of the express declaration concerning the nullity of any discriminating tax made in the cases which the court relied on. The importance of the subject, however, and the statement made by the court below as to the long existence in Tennessee of the tax exemption in favor of the products of the soil of Tennessee, leads us to a brief review of other decided cases in this court which have long since clearly established the want of power in a State to discriminate by taxation in any form against property brought from other States.

"In Guy v. Baltimore, 100 U. S. 434, the invalidity was adjudged of a municipal ordinance of the city of Baltimore which established rates of wharfage to be charged on vessels resorting to or lying at, 'landing, depositing or transporting goods or articles other than the productions of this State, on any wharf or wharves belonging to said mayor and city council, or any public wharf in the said city, other than the wharves belonging to or rented by the State.' The principle, settled by earlier decisions, which were referred to (Woodruff v. Parham, 8 Wall. 123; Hinson v. Lott, 8 Wall. 148, and Ward v. Maryland, 12 Wall. 418), was reaffirmed, the court saying (pp. 439, 442):

" 'In view of these and other decisions of this court, it must be regarded as settled that no State can, consistently with the Federal Constitution, impose upon the products of other States, brought therein for sale or use, or upon citizens because engaged in the sale therein, or the transportation thereto, of the prod-

ucts of other States, more onerous public burdens of taxes than it imposes upon the like products of its own territory. If this were not so, it is easy to perceive how the power of Congress to regulate commerce with foreign nations and among the several States could be practically annulled, and the equality of commercial privileges secured by the Federal Constitution to citizens of the several States be materially abridged and impaired. . . . The State, it will be admitted, could not lawfully impose upon such cargo any direct public burden or tax because it may consist, in whole or in part, of the products of other States. The concession of such a power to the States would render wholly nugatory all national control of commerce among the States, and place the trade and business of the country at the mercy of local regulations, having for their object to secure exclusive benefits to the citizens and products of particular States. But it is claimed that a State may empower one of its political agencies, a mere municipal corporation representing a portion of its civil power, to burden interstate commerce by exacting from those transporting to its wharves the products of other State wharfage fees, which it does not exact from those bringing to the same wharves the products of Maryland. The city can no more do this than it or the State could discriminate against the citizens and products of other States in the use of the public streets or other public highways.

"In Webber v. Virginia, 103 U. S. 344, a license statute of the State of Virginia was held to be a regulation of commerce and invalid because the tax was made to depend upon the foreign character of the articles dealt in; that is, upon their having been manufactured without the State. The court said (p. 350): 'If by reason of their foreign character the State can impose a tax upon them or upon the person through whom the sales are effected, the amount of the tax

236 Sup.—21

will be a matter resting in her discretion. She may place the tax at so high a figure as to exclude the introduction of the foreign article and prevent competition with the home product. It was against legislation of this discriminating kind that the framers of the Constitution intended to guard when they vested in Congress the power to regulate commerce among the several States.'

"In Walling v. Michigan, 116 U. S. 446, an act of the State of Michigan, which imposed a tax or duty on persons who, not having their principal place of business within the State, engaged in the business of selling, or soliciting the sale of certain described liquors, to be shipped into the State, was held to be repugnant to the commerce clause, as being 'a discriminating tax levied against persons for selling goods brought into the State from other States or countries.' The court said (p. 455) : 'A discriminating tax imposed by a State operating to the disadvantage of the products of other States when introduced into the first-mentioned State is, in effect, a regulation in restraint of commerce among the States, and as such is a usurpation of the power conferred by the Constitution upon the Congress of the United States.'

"And in the course of the opinion, referring to state decisions announcing a want of authority in the several States to prescribe different regulations in relation to the commerce in certain articles, dependent upon the State from which they were brought, the court thus referred to a decision of the Supreme Court of Missouri (p. 457) : 'In State v. North, 27 Mo. 464, where an act of Missouri imposed a tax upon merchants for all goods purchased by them, except such as might be the growth, produce, or manufacture of that State, and manufactured articles, the growth or produce of other States, it was held by the Supreme Court of that State that the law was unconstitutional and void. The court says: ''From the foregoing state-

ment of the law and facts of this case it will be seen that it presents the question of the power of the States, in the exercise of the right of taxation, to discriminate between products of this State and those manufactured in our sister States." And after an examination of the causes which led to the adoption of the Federal Constitution, one of the principals of which was the necessity for the regulation of commerce and the laying of imposts and duties by a single government, the court says: "But, whatever may be the motive for the tax, whether revenue, restriction, retaliation or protection of domestic manufacturers, it is equally a regulation of commerce, and in effect an exercise of the power of laying duties on imposts, and its exercise by the States is entirely at war with the spirit of the Constitution, and would render vain and nugatory the power granted to Congress in relation to these subjects. Can any power more destructive to the union and harmony of the States be exercised than that of imposing discriminating taxes or duties on imports from other States? Whatever may be the motive for such taxes, they cannot fail to beget irritation and to lead to retaliation; and it is not difficult to foresee that an indulgence in such a course of legislation must inflame and produce a state of feeling that would seek its gratification in any measure regardless of the consequences." ' The principle applied in the foregoing cases was also given effect in Minnesota v. Barber, 136 U. S. 313; Brimmer v. Robman, 138 U. S. 78, and Voight v. Wright, 141 U. S. 62, and so-called inspection laws of various States were held to be repugnant to the commerce clause of the Constitution because of their discriminating character. In New York v. Roberts, 171 U. S. 658, while the tax there considered, imposed by New York upon a corporation of another State, was sustained as a valid tax upon the franchise of doing business as a corporation in New York, the court reaffirmed the authority of its former

decisions declaring the invalidity of all taxes of a discriminating character levied by a State upon the products of other States.

"In this connection we excerpt from the opinion in Philadelphia Steamship Co. v. Pennsylvania, 122 U. S. 326, statements which directly relate to the subject in hand and which conclusively demonstrate the unsoundness of the proposition which the court below upheld, that is, that the commerce clause of the Constitution does not protect property brought from another State from being discriminated against after it has arrived and been commingled with the mass of property within the State of its destination. Commenting upon the reasoning of the opinion in State Tax on Railway Gross Receipts, 15 Wall. 284, the court said (122 U. S. 341): 'When the latter (imported goods) become mingled with the general mass of property in the State, they are not followed and singled out for taxation as imported goods, and by reason of their being imported. If they were, the tax would be as unconstitutional as if imposed upon them whilst in the original packages. When mingled with the general mass of property in the State they are taxed in the same manner as other property possessed by its citizens, without discrimination or partiality. We held in Welton v. Missouri, 91 U. S. 275, that goods brought into a State for sale, though they thereby become a part of the mass of its property, cannot be taxed by reason of their being introduced into the State or because they are the products of another State. To tax them as such was expressly held to be unconstitutional. The tax in the present case is laid upon the gross receipts for transportation as such. Those receipts are followed and caused to be accounted for by the company, dollar for dollar. It is those specific receipts, or the amount thereof (which is the same thing), for which the company is called upon to pay the tax. They are taxed not only because they are

money, or its value, but because they were received for transportation. No doubt a ship-owner, like any other citizen, may be personally taxed for the amount of his property or estate, without regard to the source from which it was derived, whether from commerce or banking, or any other employment. But that is an entirely different thing from laying a special tax upon his receipts in a particular employment. If such a tax is laid, and the receipts taxed are those derived from transporting goods and passengers in the way of interstate or foreign commerce, no matter when the tax is exacted, whether at the time of realizing the receipts or at the end of every six months or a year, it is an exaction aimed at the commerce itself, and is a burden upon it and seriously affects it.'

"As there can be no doubt within the principles so clearly settled by the decided cases to which we have referred, that the disputed tax which the court below sustained was a direct burden upon interstate commerce, since the law of Tennessee in terms discriminated against property the product of the soil of other States brought into the State of Tennessee, by exempting like property when produced from the soil of Tennessee, it follows that the court below erred in deciding the tax to be valid, without reference to the reasoning indulged in by it concerning the application of the equal protection clause of the Fourteenth Amendment. The judgment below must therefore be reversed and the cause remanded for further proceedings not inconsistent with this opinion."

There is no difference between the case last considered and the case at bar, save and except the statute there under consideration imposed a tax upon interstate commerce, while in this case the act imposes a license fee upon interstate commerce. That distinction, however, is wholly immaterial, for the reason that the burden thus imposed upon interstate commerce by the means of a license fee, is none the less a burden

because it is a license tax than it would have been had it been a tax imposed by the general revenue laws of the State. The effect upon interstate commerce would be exactly the same and neither can or should be tolerated. [Scott v. Donald, 165 U. S. 98, l. c. 100.]

We, therefore, hold that the Act of 1909 is void for the reason that it violates the commerce clause of section 8 of article 1 of the Constitution of the United States, and in connection therewith, section 1 of the Fourteenth Amendment thereof.

We therefore affirm the judgment of the St. Louis Court of Criminal Correction.

All concur; *Lamm* and *Graves, JJ.*, in the last paragraph of the opinion, and in the result, but they express no opinion as to any other paragraph.